[No. S113301. Apr. 5, 2004.]

DAVID VENEGAS et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Robert Mann and Donald W. Cook for Plaintiffs and Appellants.

Law Offices of John Burton, John Burton and Mary Anna Soifer for LA Police Watch as Amicus Curiae on behalf of Plaintiffs and Appellants.

Franscell, Strickland, Roberts & Lawrence, Cindy S. Lee, Jin S. Choi and Adrian J. Barrio for Defendants and Respondents County of Los Angeles, Los Angeles County Sheriff's Department, Sheriff Lee Baca, Deputy Michael Gray, Deputy Robert Harris and Deputy Thomas Jimenez.

Eduardo Olivo, City Attorney (Vernon); and John J. Cardenas for Defendants and Respondents Vernon Police Department and Detective Steven Wiles.

## OPINION

CHIN, J.—■ Does a sheriff act on behalf of the state or county when conducting a criminal investigation, including detaining suspects and searching their home and vehicle? As we shall see, based on the analysis in prior California cases, sheriffs act on behalf of the *state* when performing law enforcement activities. Under the Eleventh Amendment to the United States Constitution, and the doctrine of sovereign immunity, the state is absolutely immune from tort liability under the federal civil rights act (42 U.S.C. § 1983, hereafter section 1983). ■ Accordingly, as agents of the state when acting in their law enforcement roles, California sheriffs are likewise absolutely immune from prosecution for asserted violations of that section. We will reverse that part of the judgment of the Court of Appeal reaching a contrary conclusion in this case.

We also consider whether the sheriff's *deputies* involved here were entitled to *qualified* immunity under section 1983 because reasonable officers in their position would have believed their actions were lawful under established law. We conclude that the Court of Appeal employed incorrect legal principles in

resolving this issue. After explaining the applicable principles, we will remand to the Court of Appeal to reconsider this primarily factual issue in the context of defendants' motion for nonsuit.

Finally, we determine whether plaintiffs stated a cause of action against the County of Los Angeles (County) and its sheriff's department, sheriff, and deputies, under Civil Code section 52.1, for committing an unreasonable detention, search, and seizure. We conclude that plaintiffs did state a cause of action against these defendants, and we will affirm that portion of the Court of Appeal's judgment so holding.

## I. FACTS

The following uncontradicted facts are largely taken from the Court of Appeal's opinion in this case. The Task Force for Regional Auto Theft Prevention (TRAP) was an interagency task force run by the County's sheriff's department to facilitate theft investigations involving multiple jurisdictions. Defendant Steven Wiles, a police officer for the City of Vernon and a TRAP member, was investigating plaintiff David Venegas's brother, Ricardo Venegas, who was believed to be involved in an automobile theft ring. Wiles and other TRAP officers (evidently, defendants Michael Gray, Robert Harris and Thomas Jimenez, each sheriff's deputies) pursued a car driven by Beatriz Venegas, accompanied by her husband David. TRAP officers, noting a resemblance between David and Ricardo, stopped the car and learned that David was Ricardo's brother. David argued with the officers and they handcuffed him and detained Beatriz. Wiles questioned David about his car, which had no license plates or vehicle identification number. David told Wiles he had just bought the car and it was a salvaged vehicle. The officers impounded the car to determine whether it was stolen.

When asked for identification, David told the officers it was at his home nearby. David refused to sign an entry and search waiver form to allow the officers to pick up his identification, but he gave verbal consent for the officers to accompany Beatriz to their home for that purpose. Wiles assured the couple their home would not be searched.

TRAP officers took Beatriz home and had her sign a written entry and search waiver form granting "full and unconditional authority" to the officers to enter and conduct a search for identification and "any related investigation in any related criminal or non-criminal law enforcement matter." The officers accompanied her inside her home. While she was retrieving David's identification card, the officers searched the entire house and found papers indicating that David was on felony probation. On learning this, Wiles directed the officers to arrest David for violating Vehicle Code section 10751, subdivision (a), a misdemeanor, and for also violating his probation. Police officers

eventually booked David into custody. They detained Beatriz for two hours but did not charge her with any offense. The next day, after determining that the car was probably not stolen, Wiles directed that David be released from custody, but he was not released for another two days. No charges were ever filed against him.

Plaintiffs David and Beatriz Venegas filed an action against Wiles, the City of Vernon, the Vernon Police Department, and the County and its sheriff's department, sheriff and deputies. The complaint purported to state causes of action under section 1983 on behalf of both plaintiffs for unreasonable search and seizure, and a similar cause of action under Civil Code section 52.1, subdivision (b), on David's behalf. David also sued for false detention and arrest.

After certain of these claims were settled or resolved in defendants' favor on demurrer, the remaining ones (concerning the legality of the search of the Venegas home and the detention/arrest of David and Beatriz) were tried. After plaintiffs rested their case-in-chief, defendants moved for a nonsuit, which the trial court granted, entering judgment in defendants' favor.

Plaintiffs appealed and the Court of Appeal reversed, holding that (1) triable factual questions existed as to whether Beatriz's and/or David's detention was unreasonable and whether the search of their house was invalid; (2) the trial court erred in sustaining the demurrers of County, its sheriff's department, sheriff and deputies, to plaintiffs' section 1983 claims on the ground these persons were immune from liability; and (3) the trial court erred in sustaining these defendants' demurrers to plaintiffs' Civil Code section 52.1 cause of action on the ground plaintiffs failed to allege they were members of a protected class.

## II. STATE AGENT IMMUNITY UNDER SECTION 1983

County, on behalf of its sheriff's department and sheriff (hereafter defendants) contends that California sheriffs conducting criminal investigations are acting on behalf of the state when performing law enforcement activities. Accordingly, defendants claim that, as a state agent, the sheriff enjoys the state's immunity from prosecution for the asserted violations of section 1983 occurring in this case. Contrary to the Court of Appeal, we agree with defendants.

Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

▌ Is a sheriff engaged in a criminal investigation a "person" under section 1983? The United States Supreme Court has held that *cities, counties, and local officers* sued in their official capacity are themselves "persons" for purposes of section 1983 and, although they cannot be held vicariously liable under section 1983 for their subordinate officers' unlawful acts, they may be held directly liable for constitutional violations carried out under their own regulations, policies, customs, or usages by persons having "final policymaking authority" over the actions at issue. (*McMillian v. Monroe County* (1997) 520 U.S. 781, 784–785 [138 L.Ed.2d 1, 117 S.Ct. 1734] (*McMillian*). *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 690–692 [56 L.Ed.2d 611, 98 S.Ct. 2018] (*Monell*); see *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 348 [70 Cal.Rptr.2d 823, 949 P.2d 920] (*Pitts*); *County of Los Angeles v. Superior Court* (1998) 68 Cal.App.4th 1166, 1171 [80 Cal.Rptr.2d 860] (*Peters*).)

▌ On the other hand, *states and state officers* sued in their official capacity are not considered persons under section 1983 and are immune from liability under the statute by virtue of the Eleventh Amendment and the doctrine of sovereign immunity. (*Howlett v. Rose* (1990) 496 U.S. 356, 365 [110 L.Ed.2d 332, 110 S.Ct. 2430]; *Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58, 63–67, 71 [105 L.Ed.2d 45, 109 S.Ct. 2304]; *Pitts, supra*, 17 Cal.4th at p. 348; *Peters, supra*, 68 Cal.App.4th at p. 1171.) As *Will* stated, "it does not follow that if municipalities are persons then so are States. States are protected by the Eleventh Amendment [of the United States Constitution] while municipalities are not . . . . " (*Will, supra*, at p. 70.) *Will* continued, noting that "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. [Citation.] As such, it is no different from a suit against the State itself. [Citations.]" (*Id.* at p. 71.)
▌ The rule exempting the state and its officers applies to officers such as sheriffs if they were acting as state agents with final policymaking authority over the complained-of actions. (*McMillian, supra,* 520 U.S. at pp. 784–785.)

Defendants claim they are immune from liability under the Eleventh Amendment on the ground that in California, the sheriff acts on behalf of the state rather than the county when engaged in investigating crime. The Court of Appeal disagreed, holding that the sheriff was acting as an agent of County, not the state, while engaged in the warrantless search of plaintiffs' home. The court relied primarily on two federal cases that had concluded that California sheriffs act on behalf of the county in performing at least some of

their law enforcement functions. (*Bishop Paiute Tribe v. County of Inyo* (9th Cir. 2002) 291 F.3d 549 (*Bishop*); vacated on other grounds and remanded in *Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony* (2003) 538 U.S. 701 [155 L.Ed.2d 933, 123 S.Ct. 1887] [Indian tribes lack standing to sue under § 1983]; *Brewster v. Shasta County* (9th Cir. 2001) 275 F.3d 803, 807–808 (*Brewster*), cert. den. *sub nom. Shasta County v. Brewster* (2002) 537 U.S. 814 [154 L.Ed.2d 17, 123 S.Ct. 75].) Defendants argue these federal decisions are inapposite, and they claim that two California cases are controlling. (*Pitts, supra,* 17 Cal.4th 340; *Peters, supra,* 68 Cal.App.4th 1166.) We agree with defendants that the state cases more accurately reflect California law.

The Court of Appeal in the present case concluded that the sheriff, exercising his or her crime investigation functions (here, searching plaintiffs' house and seizing certain documents), acted as an agent of County, not the state. The court, largely ignoring *Pitts,* found *Peters* factually distinguishable because it involved the limited question whether the sheriff, in setting policies concerning the release of persons from county jail, acts on behalf of the state or county. The Court of Appeal therefore found *Peters* not dispositive of the issue whether sheriffs act for the state in carrying out crime investigations. Accordingly, the appellate court looked to the two above-cited federal cases holding that California sheriffs are county actors when investigating crime occurring within the county. (*Bishop, supra,* 291 F.3d at p. 566; *Brewster, supra,* 275 F.3d at pp. 807–808; see also *Cortez v. County of Los Angeles* (9th Cir. 2002) 294 F.3d 1186, 1191–1192 [sheriff's department acts as county agent in administering county jail policies]; *Streit v. County of Los Angeles* (9th Cir. 2001) 236 F.3d 552, 559–565 [same].)

Based on its analysis of these federal cases, and its belief that a contrary rule would preclude all section 1983 suits against local law enforcement officers, the Court of Appeal concluded that the trial court erred in sustaining the demurrers of the County and its sheriff's department and sheriff. We disagree. As is apparent, resolution of the question before us inevitably involves careful analysis of several state and federal cases. We start with the two California cases deemed by defendants to be most apposite, and then consider the principal federal cases cited by plaintiffs and relied on by the Court of Appeal.

A. *Pitts*

In *Pitts,* persons whose child molestation convictions were reversed on appeal brought civil actions against the County of Kern and its district attorney and his employees, asserting civil rights violations under section 1983 arising from alleged misconduct during the criminal prosecution. The district attorney and his employees prevailed under the doctrine of prosecuto-

rial immunity and, accordingly, *Pitts* was concerned only with the liability of the county. (*Pitts, supra,* 17 Cal.4th at pp. 345–347, 352.)

■ The plaintiffs' action against the county alleged that its district attorney had established a pattern or practice of procuring false statements and testimony by threats, promises, and intimidation, and also failed to provide adequate training procedures and regulations to prevent such conduct. (*Pitts, supra,* 17 Cal.4th at p. 352.) As noted above, although the county could not be held vicariously liable under section 1983, it could be held directly liable for constitutional violations carried out under its own policies. (*Monell, supra,* 436 U.S. at pp. 690–692.) *Pitts* held, however, that a district attorney represents the state rather than the county when preparing to prosecute crimes and training and developing policies for prosecutorial staff. *Although Pitts involved district attorneys rather than sheriffs, the court relied on statutes and analysis applying to both kinds of officers.*

■ In *Pitts*, we first observed that the question whether a public official represents a county or a state when acting in a particular capacity is analyzed under state, not federal law. (*Pitts, supra,* 17 Cal.4th at pp. 352–353, 356; see *McMillian, supra,* 520 U.S. at p. 786 [determining actual functions of government officer is dependent on relevant state law].) For guidance in resolving this question, *Pitts* next turned to *McMillian,* which had examined Alabama state law to determine whether a sheriff was a state or county official. In *McMillian,* after his murder conviction was reversed due to suppression of exculpatory evidence, the plaintiff sued an Alabama sheriff for damages under section 1983 for intimidating a witness and withholding evidence. The United States Supreme Court examined Alabama's constitutional and statutory provisions concerning sheriffs and concluded that, while executing their law enforcement duties in Alabama, sheriffs are executive officers of the state, not the county, and accordingly are immune from section 1983 liability. (*McMillian, supra,* 520 U.S. at pp. 791–793.)

Among other factors, the *McMillian* court considered the role of sheriffs as state representatives under the Alabama Constitution and Alabama statutes, the authority of Alabama sheriffs to enforce state criminal laws in their counties, and the lack of similar enforcement authority by the counties themselves. (*McMillian, supra,* 520 U.S. at pp. 787–791.) *McMillian* concluded that these factors outweighed several countervailing factors that supported the conclusion that Alabama sheriffs were officers of the county, namely, that the county paid the sheriffs' salary and provided them with equipment, lodging and expenses, that the sheriffs' jurisdiction was limited by county borders, and that county voters elected these sheriffs. (*Id.* at pp. 791–792.)

■ Pitts applied *McMillian*'s analytical framework to conclude that a California district attorney acts on behalf of the state rather than the county in preparing to prosecute crimes and in training and developing policies for prosecutorial staff. (*Pitts, supra,* 17 Cal.4th at pp. 356–366.) In reaching its conclusion, the court considered several constitutional and statutory provisions tending to support or negate state agency, but placed special emphasis on article V, section 13, of the state Constitution, providing that "[t]he Attorney General shall have direct supervision over every district attorney . . . in all matters pertaining to the duties of their . . . offices . . . ." Under this same provision, the Attorney General may require district attorneys to make appropriate reports "concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions," and may prosecute violations of law if, in his or her opinion, state laws are not adequately being enforced in any county. (*Pitts, supra,* 17 Cal.4th at pp. 356–357.) We also noted in *Pitts* that Government Code sections 12550 and 12524, and Penal Code section 923 contain similar provisions placing county district attorneys under the supervision of the state Attorney General. (*Pitts, supra,* at pp. 357–358, & fn. 5.)

■ We observed in *Pitts* that, in contrast to the broad supervisory powers of the Attorney General over district attorneys, Government Code section 25303 bars county boards of supervisors from affecting or obstructing the district attorneys' investigative or prosecutorial functions. (*Pitts, supra,* 17 Cal.4th at p. 358.) We also pointed out that a district attorney acts in the name of the People of the state when prosecuting criminal violations of state law. (*Id.* at p. 359.)

*Pitts* readily acknowledged that other constitutional and statutory provisions would support a conclusion that a district attorney is a county officer: For example, county voters elect district attorneys (Cal. Const., art. XI, § 4, subd. (c)), who are listed as county officers (Gov. Code, § 24000, subd. (a)), are generally ineligible to hold office unless they are registered voters of the county in which they perform their duties (Gov. Code, § 24001), and are compensated as prescribed by the county board of supervisors (Gov. Code, § 25300). (*Pitts, supra,* 17 Cal.4th at pp. 360–361.) Furthermore, under Government Code section 25303, the county board of supervisors supervises the district attorney's official conduct and expenditure of funds, although it cannot affect the district attorney's independent investigative and prosecutorial functions. (*Pitts, supra,* at p. 361.) Necessary expenses incurred by the district attorney in the prosecution of criminal cases are considered county charges. (Gov. Code, § 29601, subd. (b)(2).)

Yet, after balancing the competing factors, and relying on *McMillian*'s similar analysis, we concluded in *Pitts* that, *when preparing to prosecute and*

*prosecuting crimes*, a district attorney represents the state, and is not considered a policy maker for the county. (*Pitts, supra,* 17 Cal.4th at p. 362.) We similarly concluded that a district attorney does not represent the county *when training staff and developing policy in the area of criminal investigation and prosecution.* We stated that "[n]o meaningful analytical distinction can be made between these two functions [i.e., prosecuting crime on the one hand, and training/policymaking regarding criminal investigation and prosecution on the other]. Indeed, a contrary rule would require impossibly precise distinctions." (*Ibid.*) Thus, the constitutional and statutory provisions discussed above give the Attorney General "oversight not only with respect to a district attorney's actions in a particular case, but also in the training and development of policy intended for use in every criminal case." (*Id.* at p. 363.)

### B. *Peters*

 As noted, *Pitts* involved the question whether district attorneys were state agents when investigating and prosecuting crime, or when training staff and developing policy involving such matters. *Peters, supra,* 68 Cal.App.4th 1166, applied *Pitts*'s analysis and extended it to California sheriffs, concluding that in setting policies concerning the release of persons from the county jail, the sheriff acts as a state officer performing state law enforcement duties. Although *Peters* did not consider whether a sheriff acts as a state or county officer when, as here, investigating criminal activity, *Peters*'s reasoning would clearly apply to the present case.

The plaintiff in *Peters* brought a civil rights action under section 1983, alleging that the sheriff and his deputies, relying on an inapposite arrest warrant, improperly detained her in county jail after she had posted bail. *Peters* applied the *McMillan/Pitts* analysis to determine whether a California sheriff acts as a state or county officer in setting policies governing release of prisoners from the county jail. *Peters* found *Pitts* to be controlling, noting that *the same constitutional and statutory provisions governing district attorneys considered in Pitts also apply to sheriffs.* (*Peters, supra,* 68 Cal.App.4th at pp. 1170, 1174–1175.)

For example, article V, section 13 of the California Constitution provides that subject to the powers and duties of the Governor, "[t]he Attorney General *shall have direct supervision over every district attorney and sheriff* and over such other law enforcement officers as may be designated by law, *in all matters pertaining to the duties of their respective offices,* and may require any of said officers to make reports *concerning the investigation, detection, prosecution, and punishment of crime* in their respective jurisdictions as the Attorney General may seem advisable." (Italics added.)

■ Similarly, Government Code section 12560, which relates to sheriffs, is substantially identical to Government Code section 12550, which relates to district attorneys and was relied on in *Pitts*. Section 12560 gives the Attorney General "direct supervision" of all sheriffs, with power to order reports "concerning the investigation, detection and punishment of crime in their respective jurisdictions," and to direct their activities regarding these investigations. *Peters* also cited Government Code sections 26600 (sheriffs' duty to preserve the peace through crime prevention projects), 26601 (sheriffs' authority to arrest criminal offenders), and 26602 (sheriffs' duty to prevent breaches of peace and investigate public offenses). As in *Pitts,* the court in *Peters* found all these provisions instructive on the issue whether a sheriff acts as a state or county agent in establishing policies for the release of arrestees from jail. (*Peters, supra,* 68 Cal.App.4th at pp. 1174–1175.)

■ In addition, *Peters* pointed out that, as in *Pitts* with respect to district attorneys, the county board of supervisors has no direct control over a sheriff's performance of law enforcement functions. Government Code section 25303, upon which *Pitts* relied for this proposition, applies to both offices. Among other things, that section reaffirms "the independent and constitutionally and statutorily designated *investigative and prosecutorial functions of the sheriff and district attorney* of a county. The board of supervisors shall not obstruct the *investigative function of the sheriff* of the county nor shall it obstruct the *investigative and prosecutorial function of the district attorney* of a county. [¶] Nothing contained herein shall be construed to limit the budgetary authority of the board of supervisors over the district attorney or sheriff." (Gov. Code, § 25303, italics added; see *Peters, supra,* 68 Cal.App.4th at p. 1175.)

■ As in *Pitts, supra,* 17 Cal.4th at pages 360–361, *Peters* acknowledged that other constitutional and statutory provisions tended to support a theory of county agency. For example, article XI, sections 1, subdivision (b), and 4, subdivision (c), of the state Constitution provide for "an elected sheriff" in each county, and Government Code section 24000 includes sheriffs within the general category of county officers. But as in *Pitts, Peters* concluded that these provisions were outweighed by those supporting the argument that sheriffs are not policy makers for the county board of supervisors but are functionally independent of county control when performing their law enforcement functions. (*Peters, supra,* 68 Cal.App.4th at pp. 1176–1177.)

C. *Brewster and Bishop decisions*

■ As indicated above, the Court of Appeal in this case relied on federal Ninth Circuit cases that had reached conclusions seemingly contrary to *Pitts* and *Peters*. (*Bishop, supra,* 291 F.3d at p. 566; *Brewster, supra,* 275

F.3d at pp. 807–808.) These cases, while purporting to defer to state law as required by *McMillian, supra,* 520 U.S. at page 786, nonetheless ultimately took the position that questions regarding section 1983 liability implicate federal law and accordingly were not necessarily controlled by *Pitts* or *Peters.* (See *Bishop, supra,* 291 F.3d at pp. 562, 564–565 [*Pitts* factually distinguishable]; *Brewster, supra,* 275 F.3d at pp. 807, 811 [expressly declining to follow *Peters*].) Lower federal court decisions such as *Brewster* and *Bishop* may be entitled to great weight but they are not binding on this court. (E.g., *People v. Avena* (1996) 13 Cal.4th 394, 431 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].) In any event, having reviewed those federal decisions, we conclude that they erred in failing to follow the guidance given by *McMillian, Pitts,* and *Peters.*

**1. *Brewster*—**In *Brewster,* Shasta County and its sheriff's department allegedly violated the plaintiff's civil rights during a murder investigation by manipulating a witness into making a false identification, failing to test physical evidence, and ignoring exculpatory evidence. (*Brewster, supra,* 275 F.3d at p. 805.) *Brewster* concluded that the sheriff was acting as a county agent during the investigation. The court concentrated on such factors as (1) inclusion of sheriffs as county officers in state Constitution article XI, section 1, subdivision (b), and Government Code section 24000, and (2) county supervision of sheriffs' activities under Government Code section 25303. (*Brewster, supra,* 275 F.3d at pp. 806–808.) Yet, as we noted above, *Pitts* and *Peters* found these factors insufficient to establish a county agency relationship with, respectively, district attorneys and sheriffs when performing law enforcement functions. (*Pitts, supra,* 17 Cal.4th at pp. 360–362; *Peters, supra,* 68 Cal.App.4th at p. 1176.)

*Brewster,* like Justice Werdegar's concurring and dissenting opinion herein, also deemed significant the fact that monetary damages assessed against sheriffs for section 1983 claims would be paid by the counties, not the state. (*Brewster, supra,* 275 F.3d at pp. 807–808, citing Gov. Code, § 815.2, subd. (a) [vicarious liability of government agencies for employee's torts].) Section 815.2, subdivision (a), applies, however, to *both* the state and counties (*Pitts, supra,* 17 Cal.4th at p. 360, fn. 7), and although it may provide a general basis for vicarious public liability, significantly subdivision (b) of the section immunizes *both* the state and county from torts that are committed by employees who are themselves immune. So, we dispute the present relevance of section 815.2, as it fails to answer the questions whether the sheriff was indeed acting as a county, not state, employee during the events in question, and whether he lacked immunity from federal civil rights actions—the very questions we are attempting to answer here.

In addition, we think the *Brewster* analysis is faulty for other reasons. As *Brewster* earlier acknowledged, if sheriffs indeed are acting as state agents in crime investigations, they would be immune from liability under section 1983 if sued in their official capacity, and their counties would not be liable for their actions. (*Brewster, supra,* 275 F.3d at p. 805 ["if [the sheriff] is a policymaker for the state, then the county cannot be liable for his actions"].)

■ To the extent *Brewster* was referring to a sheriff's liability when sued in his *personal* capacity, we have no occasion here to consider whether the Los Angeles County Sheriff is personally immune under any California statute. We note, however, that apart from the immunity sheriffs would enjoy while acting as state agents, sheriffs enjoy additional immunities under Government Code section 820.2 (discretionary acts) or section 820.4 (executing or enforcing laws). Significantly, *Pitts* discarded a similar argument under section 815.2, subdivision (a), because of the immunity of the district attorney under section 821.6 (instituting or prosecuting an action). (See *Pitts, supra,* 17 Cal.4th at p. 360, fn. 7.)

In any event, even assuming California sheriffs lack such immunity, the fact that their counties may be called on to pay any tort damage judgment rendered against their sheriffs sued in their personal capacity is only one of the many factors *McMillian* requires us to consider. That single factor, if it truly exists, is outweighed by the constitutional and statutory provisions discussed above, demonstrating that a sheriff represents the state, not the county, when performing law enforcement duties in his official capacity.

The concurring and dissenting opinion of Justice Werdegar suggests that the high court in *McMillian* found the vicarious liability point "critical" to its holding, but we read the case differently. What the high court found "critical" was the fact that the Alabama Supreme Court had determined that the framers of the Alabama Constitution took steps to ensure that its sheriffs would be considered executive officers of the state. (*McMillian, supra,* 520 U.S. at pp. 788–789.) Based on these critical factors, Alabama cases later concluded that sheriffs are state officers so that tort claims against them are deemed suits against the state. (*Id.* at p. 789.) The analysis in this opinion is consistent with *McMillian,* for our review of our state's Constitution and statutes similarly convinces us that sheriffs while performing law enforcement duties are state agents, so that the present suits should be deemed suits against the State of California.

Justice Werdegar relies in part on *Hess v. Port Authority Trans-Hudson Corporation* (1994) 513 U.S. 30, 48 [130 L.Ed.2d 245, 115 S.Ct. 394], as emphasizing the importance of the " 'the vulnerability of the State's purse' " (conc. & dis. opn., *post,* at p. 855), but that case did not involve a section

1983 claim but was an action brought under the Federal Employers Liability Act against a multistate port authority, which unsuccessfully sought Eleventh Amendment immunity as a state agent. Interestingly, Justice Ginsburg wrote *Hess*, and several years later, she wrote the dissent in *McMillian*, joined by three other justices. In the latter case, as Justice Werdegar observes, the majority noted that the state would be liable for tort judgments against an Alabama sheriff. However, in her dissent in *McMillian* arguing that sheriffs are county, not state officers, Justice Ginsburg fails even to mention this factor. Rather, she cites such factors as the inclusion of Alabama sheriffs in the executive department, and impeachment of sheriffs by state officers, and says, "these measures are the strongest supports for the Court's classification of county sheriffs as state actors." (*McMillian, supra,* 520 U.S. at p. 798.)

Surely, if payment of tort judgments were indeed the critical factor in determining whether a sheriff was a state officer, Justice Ginsburg, who authored *Hess*, would have at least mentioned that factor, and indeed would have been required to distinguish it, in her subsequent dissent in *McMillian*. Thus, it appears that we are instead instructed by both the majority and the dissenting opinions in *McMillian* to consider a variety of factors, not simply one, under state law in reaching an "understanding of the actual function of a governmental official, in a particular area." (*McMillian, supra,* 520 U.S. at p. 786.)

Justice Werdegar's opinion also asserts that unquestionably a California sheriff is a county employee for purposes of Government Code section 815.2, citing *Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 717 [117 Cal.Rptr. 241, 527 P.2d 865]. But *Sullivan* was not faced with the question whether such a sheriff might be deemed a *state* agent for purposes of federal section 1983 civil rights liability, or indeed for any other purpose. The question simply was not before us in that case. Thus, section 815.2 seemingly adds nothing helpful to the resolution of the question whether sheriffs are state or county agents.

**2. *Bishop***—In *Bishop, supra,* 291 F.3d 549, a Native American tribe and its wholly owned gaming corporation sued the County of Inyo, its district attorney, and its sheriff, seeking equitable and monetary relief and alleging these defendants conducted an unlawful records search on tribal property. The federal appeals court in its now vacated opinion in *Bishop* concluded that *both* the district attorney and sheriff were acting as county officers in obtaining and executing an invalid search warrant aimed at uncovering welfare fraud. (*Bishop, supra,* 291 F.3d at pp. 562–566.) As in *Brewster, supra,* 275 F.3d at pages 806–808, the *Bishop* court relied on such factors as (1) inclusion of district attorneys and sheriffs as county officers in state Constitution article XI, section 1, subdivision (b), and Government Code

section 24000, and (2) county supervision of the district attorney's and sheriff's activities under Government Code section 25303. (*Bishop, supra,* at pp. 563–564.) As we noted above, *Pitts* and *Peters* deemed these factors insufficient to establish a county agency relationship with, respectively, district attorneys and sheriffs when performing law enforcement activities. (*Pitts, supra,* 17 Cal.4th at pp. 360–362; *Peters, supra,* 68 Cal.App.4th at p. 1176.)

Acknowledging the constitutional and statutory supervisory authority of the state Attorney General over district attorneys and sheriffs *in their law enforcement functions, Bishop* nonetheless expressed concern that "to allow the Attorney General's supervisory role to be dispositive . . . would prove too much," for "if taken to its logical extreme, *all* local law enforcement agencies in California would be immune from prosecution for civil rights violation," contrary to *Monell*'s holding (*Monell, supra,* 436 U.S. at pp. 690–692) preserving section 1983 actions against local agencies. (*Bishop, supra,* 291 F.3d at p. 564.) To the contrary, merely because the sheriff is a state officer, as demonstrated by the foregoing constitutional and statutory provisions, does not mean that all local law enforcement officers are also to be deemed state officers.

*Pitts* and *Peters* are clearly confined, respectively, to situations in which district attorneys and sheriffs are actually engaged in performing law enforcement duties, such as investigating and prosecuting crime, or training staff and developing policy involving such matters. (See *Pitts, supra,* 17 Cal.4th at p. 366; *Peters, supra,* 68 Cal.App.4th at p. 1172.) Immunizing these persons when actually engaged in such activities would not violate *Monell*'s broad refusal to find all local agencies immune from suit under section 1983. Other torts or civil rights violations by these and other local officers might well be deemed acts committed by county agents, for which they and their counties could be responsible. As *Peters* states, "This determination does not require an 'all-or-nothing' categorization applying to every type of conduct in which the official may engage. Rather, the issue is whether the official is a local policymaker with regard to the particular action alleged to have deprived the plaintiff of civil rights. [Citations.]" (*Peters, supra,* at p. 1172.)

Moreover, *Bishop*'s analysis appears to express a policy concern (overly broad immunity from suit) that is extraneous to the high court's factor-balancing test employed in *McMillian, supra,* 520 U.S. at pages 786, 790–791, a test that, as *Brewster* acknowledged, requires a weighing of the state's Constitution, statutes, and case law. (*Brewster, supra,* 275 F.3d at p. 806.)

*Bishop* also stressed the fact that the search warrant at issue there sought to disclose evidence of welfare fraud, a matter falling within the jurisdiction of

the *county's* health and human services department. (*Bishop, supra,* 291 F.3d at p. 565.) The fact remains, however, that welfare fraud is a *state* offense (e.g., Welf. & Inst. Code, §§ 11482–11483). Attempting to distinguish *Pitts, supra,* 17 Cal.4th 340, the *Bishop* court observed that *Pitts* involved prosecutorial conduct, whereas *Bishop* concerned investigating possible welfare fraud in advance of prosecution. (*Bishop, supra,* at pp. 564–565.) But nothing in *Pitts* supports such a fine distinction. Indeed, *Pitts*'s precise holding was that a district attorney "is a state official *when preparing to prosecute* and when prosecuting criminal violations of state law." (*Pitts, supra,* at p. 360, italics added.) It is noteworthy that the plaintiffs in *Pitts* had alleged misconduct (procuring false witness statements and failing to provide adequate training procedures) squarely falling in the preprosecution category. (*Id.* at p. 352.)

**3. Conclusion**—In short, we are unconvinced that either *Brewster* or *Bishop* affords cogent reasons for ruling that in California, sheriffs act as county officers in performing their law enforcement activities. We conclude that, following the analysis prescribed in *McMillian, Pitts* and *Peters,* California sheriffs act as state officers while performing state law enforcement duties such as investigating possible criminal activity.

Plaintiffs assert that even if the sheriff acted as a state agent in this case, County's other agents and employees played such a significant role in the events as to justify its liability. The limited issue before us, however, involves the potential liability of the County for the acts of its sheriff. The question of the County's liability for the acts of other persons is not before us.

We conclude the trial court properly sustained the demurrers of County, its sheriff's department, and its sheriff to plaintiffs' civil rights action under section 1983.

III. Qualified Immunity of Sheriff's Deputies Under Section 1983

As *McMillian* explains, the rule exempting the state and its officers from liability under section 1983 applies to officers such as sheriffs only if they were acting as state agents with final policymaking authority over the complained-of actions. (*McMillian, supra,* 520 U.S. at pp. 784–785.) Accordingly, the parties in this case have correctly assumed that the sheriff's *deputies* would not be shielded by the sheriff's own state agent immunity, and are "persons" who may be held liable for damages under section 1983 for violating someone's constitutional rights. County, however, argues these deputies were entitled to *qualified* immunity under section 1983 because reasonable officers in their position would have believed their actions were lawful under established law. (See *Saucier v. Katz* (2001) 533 U.S. 194,

201–202 [150 L.Ed.2d 272, 121 S.Ct. 2151] (*Saucier*); *Hunter v. Bryant* (1991) 502 U.S. 224, 227 [116 L.Ed.2d 589, 112 S.Ct. 534].) Because this issue is primarily a factual one once the correct legal principles are identified, and the factual record is extensive, we will remand the case to the Court of Appeal for a redetermination of the issue.

■ Saucier furnishes adequate guidance as to the controlling principles. A rule of qualified immunity shields a public officer from an action for damages under section 1983 unless the officer has violated a "clearly established" constitutional right. (*Saucier, supra,* 533 U.S. at p. 201.) As stated in *Saucier,* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. [Citation.]" (*Id.* at p. 202.) The high court explained that "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." (*Ibid.*) *Saucier* confirmed that, despite a possible Fourth Amendment violation, officers still must be granted immunity "for reasonable mistakes as to the legality of their actions." (*Id.* at p. 206.)

■ The plaintiff in *Saucier* brought a section 1983 action against police officers, alleging that they used excessive force in arresting him. At issue was whether the immunity analysis was so intertwined with the question of excessive force that the qualified immunity and constitutional violation issues should be treated as one question, to be decided by the trier of fact. The Ninth Circuit Court of Appeals held that the inquiries merged into a single question for the jury. The United States Supreme Court reversed, holding that the ruling on qualified immunity required an analysis separate from the question whether unreasonable force was used in making the arrest. (*Saucier, supra,* 533 U.S. at p. 199.) *Saucier* set forth the following framework for ruling on a claim of qualified immunity: First, accepting the plaintiff's allegations as true, was a constitutional right violated? If so, was the right so well established that it would be clear to a reasonable officer that his conduct was unlawful in the circumstances? (*Ibid.*)

Thus, *Saucier* makes clear that a ruling on qualified immunity requires an analysis separate from the question whether a constitutional violation occurred. Yet, the Court of Appeal in this case appeared to assume that a bare showing of possible constitutional rights violations would be sufficient to avoid defendants' motion for nonsuit. The court phrased the relevant inquiry as simply whether the evidence, viewed in plaintiffs' favor, "support[ed] a determination that respondents' conduct violated a federal right under the Fourth Amendment," and proceeded to find sufficient evidence to support such a violation. This analysis seemingly ignores *Saucier* and its emphasis on

whether a reasonable officer would believe his conduct clearly unlawful. Without such a finding, defendant deputies would be immune from a section 1983 action. Significantly, the Court of Appeal opinion failed to cite *Saucier*, which was decided only a few months earlier.

Here, as the Court of Appeal noted, the trial court in granting nonsuit expressly found that the officers "acted reasonably by any objective standard." The briefs before us argue at length as to whether or not the record supports that finding. Given the Court of Appeal's failure to consider *Saucier* and review the evidence with the *Saucier* principles in mind, it is appropriate that the Court of Appeal reconsider this primarily factual issue.

## IV. LIABILITY OF COUNTY AND ITS SHERIFF UNDER CIVIL CODE SECTION 52.1

Finally, County argues that the Court of Appeal erred in concluding plaintiffs could state a cause of action against County, its sheriff's department and its sheriff, under Civil Code section 52.1, for unreasonable search and seizure. According to County, the section applies only to so-called hate crimes and requires a showing, not alleged here, that the defendants acted with "discriminatory animus," i.e., an intent to threaten or coerce another in violation of their constitutional rights, based on the victim's actual or apparent racial, ethnic, religious, or sexual orientation or other minority status. (See, e.g., *In re Michael M.* (2001) 86 Cal.App.4th 718, 725–726 [104 Cal.Rptr.2d 10] [describing the intent element underlying hate crime legislation].) We disagree, as nothing in Civil Code section 52.1 requires any showing of actual intent to discriminate.

Civil Code section 52.1, subdivision (a), provides that if a person interferes, or attempts to interfere, by threats, intimidation, or coercion, with the exercise or enjoyment of the constitutional or statutory rights of "any individual or individuals," the Attorney General, or any district or city attorney, may bring a civil action for equitable or injunctive relief. Subdivision (b) allows "[a]ny individual" so interfered with to sue for damages. Subdivision (g) states that an action brought under section 52.1 is "independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law," including Civil Code section 51.7.

Civil Code section 51.7, a separate and independent enactment referred to in section 52.1, declares that all persons have the right to be free from violence or intimidation because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because they are perceived by another to have

any of these characteristics. Section 52, subdivision (b), makes persons who violate section 51.7 liable for actual and exemplary damages and penalties.

■ Boccato v. City of Hermosa Beach (1994) 29 Cal.App.4th 1797, 1809 [35 Cal.Rptr.2d 282], concluded that a plaintiff who brings an action under Civil Code section 52.1 must be a member of one of the classes protected by Civil Code section 51.7. Thereafter, in 2000, after the events giving rise to this action, the Legislature enacted Assembly Bill No. 2719 (1999–2000 Reg. Sess.) (hereafter Assembly Bill 2719) to explain that *Boccato* erred in that assumption, and to clarify that Civil Code section 52.1 applies to an affected plaintiff "without regard to his or her membership in a protected class identified by its race, color, religion, or sex, among other things." (Stats. 2000, ch. 98, § 1.)

The Court of Appeal in the present case determined that the trial court, relying on *Boccato*'s erroneous interpretation of the statute, improperly sustained demurrers without leave to amend to plaintiffs' cause of action under Civil Code section 52.1. The appellate court recognized that the pronouncements in 2000 of legislative intent did not apply in this case, but based on its independent interpretation of the statute, the court rejected *Boccato* and determined that Civil Code section 52.1 did not, in 1998, require a plaintiff to be a member of a protected class.

County evidently agrees with the Court of Appeal's analysis in this respect, as it does not presently rely on *Boccato,* which indeed seems inconsistent with the statutory language of Civil Code section 52.1, subdivision (b), allowing "[a]ny *individual*" (italics added) whose exercise or enjoyment of constitutional or statutory rights has been interfered with to sue the perpetrator for damages. Had the Legislature intended to limit the scope of section 52.1 to individuals protected under section 51.7, it could easily have done so.

Instead of asserting that *Boccato* controls, County narrowly reads Assembly Bill 2719 as clarifying that a person can state a cause of action under Civil Code section 52.1 only if he or she is the victim of intimidation or interference based on an actual *or perceived* class or characteristic protected under section 51.7. We see no reasonable basis for such an interpretation. Assembly Bill 2719 explained that "[s]ection 52.1 of the Civil Code guarantees the exercise or enjoyment by *any individual or individuals* of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state *without regard to his or her membership in a protected class* identified by its race, color, religion, or sex, among other things." (Italics added.) We cannot reasonably interpret this language, or the unambiguous language of section 52.1 itself, to restrict the benefits of the section to persons who are actual or perceived members of a

protected class. Such an interpretation could have anomalous results, permitting or disallowing recovery based solely on the defendant's perceptions of the plaintiff's protected status.

In *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844, 949 P.2d 941], we acknowledged that Civil Code section 52.1 was adopted "to stem a tide of hate crimes." But contrary to County's position, our statement did not suggest that section 52.1 was limited to such crimes, or required plaintiffs to demonstrate that County or its officers had a discriminatory purpose in harassing them, that is, that they committed an actual hate crime. We continued in *Jones* by simply observing that the language of section 52.1 provides remedies for "certain misconduct that interferes with" federal or state laws, if accompanied by threats, intimidation, or coercion, and whether or not state action is involved. (*Jones, supra,* at p. 338.) Plaintiffs have alleged such misconduct here.

County predicts that allowing unrestricted civil actions under Civil Code section 52.1 will result in "an incalculable increase in the filing of lawsuits in our State's courts," imposing heavy burdens on "the already financially-strapped court system . . . ." County observes that if section 52.1 indeed applied to all tort actions, the section would provide plaintiffs in such cases significant civil penalties and attorney fees as well as compensatory damages.

█ First, Civil Code section 52.1 does not extend to all ordinary tort actions because its provisions are limited to threats, intimidation, or coercion that interferes with a constitutional or statutory right. Second, imposing added limitations on the scope of section 52.1 would appear to be more a legislative concern than a judicial one, and perhaps the Legislature would be advised to reexamine the matter. But we need not decide here whether section 52.1 affords protections to every tort claimant, for plaintiffs in this case have alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims. █ All we decide here is that, in pursuing relief for those constitutional violations under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion. The Court of Appeal was correct in holding that plaintiffs adequately stated a cause of action under section 52.1.

## V. · CONCLUSION

The judgment of the Court of Appeal is reversed as to plaintiffs' asserted causes of action under 42 United States Code section 1983, and we remand to that court for its redetermination of the qualified immunity issue in light of our opinion. The Court of Appeal's judgment sustaining plaintiffs' causes of action under Civil Code section 52.1 is affirmed.

George, C. J., Baxter, J., and Brown, J., concurred.

**BAXTER, J.,** Concurring.—I concur in the majority opinion's conclusion that the Los Angeles County Sheriff acted as an agent of the state in undertaking the criminal investigation in this case, and that under Eleventh Amendment sovereign immunity principles, the sheriff was immune from prosecution for the asserted violations of the Federal Civil Rights Act of 1871 (42 U.S.C. § 1983 (section 1983)). (Majority opn. of Chin, J., *ante,* pt. II.) I further concur in the majority opinion's discussion of the qualified immunity defense that may be available to the sheriff's deputies with regard to those same section 1983 claims. (Majority opn., *ante,* pt. III.)

With considerably less enthusiasm, I also join in the majority opinion's determination that, given the unambiguous language of subdivision (g) of Civil Code section 52.1 (section 52.1), plaintiffs adequately pleaded a cause of action "for unreasonable search and seizure" under that section notwithstanding their failure to allege that defendants acted with intent to discriminate, also commonly referred to as discriminatory animus. (Majority opn., *ante,* pt. IV.) I write separately to voice my concern that the Legislature, in amending section 52.1 by adding subdivision (g) in response to the Court of Appeal decision in *Boccato v. City of Hermosa Beach* (1994) 29 Cal.App.4th 1797, 1809 [35 Cal.Rptr.2d 282] (*Boccato*), might have inadvertently transformed section 52.1 from its originally intended purpose as a weapon in the arsenal of interrelated statutory provisions designed to combat the rising incidence of hate crimes, to a generally applicable catchall provision that will encourage claimants to seek section 52.1's sweeping remedies—including compensatory money damages, very substantial fines ($25,000), attorney fees, and other equitable relief—in commonplace tort actions to which those special statutory remedies were never intended to apply. As Los Angeles County (County) urges, to give effect to the literal language of section 52.1, subdivision (g) could result in an incalculable increase in the filing of lawsuits in our state's courts and impose an inordinately heavy burden on our already financially strapped court system.

As will be explained, because the language of section 52.1 as amended through the addition of subdivision (g) is unambiguous, this court must dutifully construe it according to the plain import of its express terms. It is ultimately within the Legislature's purview to determine if section 52.1, as amended, accurately effectuates the purpose and intent behind this antidiscrimination legislation, or whether the literal language of the amended statutory scheme now paints with far too broad a brush. I believe the Legislature would be well advised to reexamine the matter, and for that purpose, I offer the following brief survey of relevant legislative history and decisions of this and other courts to demonstrate that section 52.1 has always

been understood as the anti-hate-crime tool it was originally intended to be, and that the section has also long been understood as requiring that one charged with a violation of its letter and spirit must be shown to have acted with discriminatory intent.

## I

The legislative history of section 52.1 clearly reflects that it was originally enacted "to stem a tide of hate crimes." (*Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844, 949 P.2d 941].) Nearly every court which has construed this statute has recognized that in light of its original purpose—to combat hate crimes—a violation of section 52.1 requires a showing that the defendant acted with discriminatory animus, i.e., an intent to interfere "by threats, intimidation, or coercion" (§ 52.1, subd. (a)) with the victim's exercise or enjoyment of his or her constitutional or statutory rights, based on the victim's actual or perceived racial, ethnic, religious, or sexual orientation or other minority status. (See, e.g., *In re Michael M.* (2001) 86 Cal.App.4th 718, 725–726 [104 Cal.Rptr.2d 10] [defining requisite intent for hate crimes].)

Section 52.1, commonly referred to as the "Tom Bane Civil Rights Act" or the "Bane Act," was enacted in 1987 as part of a renewed effort to combat the disturbing rise in "hate crimes," or, put otherwise, the rising incidence of civil rights violations motivated by hatred and discrimination. This purpose of the legislation is undeniably evidenced by both its legislative history and the case law interpreting it, including several decisions of this court.

The Legislature's focused effort to combat discriminatory and pernicious conduct often referred to as hate crimes began with the 1976 enactment of Civil Code section 51.7, commonly referred to as the "Ralph Civil Rights Act" or the "Ralph Act." That legislation provides, in pertinent part: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. . . ." (§ 51.7, subd. (a).) The obvious purpose of the Ralph Act is to declare unlawful, and civilly actionable, any *acts of violence or intimidation by threats of violence* directed against any individual because of his actual or perceived membership in a minority or similarly protected class.

It is particularly noteworthy that the enumerated list of protected classes of persons found in the Ralph Act was never intended to be exclusive. Section 51.7 expressly provides that, "The identification in this subdivision of

particular bases of discrimination *is illustrative rather than restrictive.*" (§ 51.7, subd. (a), italics added.)

In this same vein, 10 years later, the Legislature enacted section 52.1 to further address the rising tide of hate crimes in California. As originally enacted, the core provisions of section 52.1 read:

"(a) Whenever a person or persons, whether or not acting under color of law, interferes by *threats, intimidation, or coercion*, . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right or rights secured.

"(b) Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her name and on his or her own behalf a civil action for injunctive and other appropriate equitable relief *to protect the peaceable exercise or enjoyment of the right or rights secured.*" (Added by Stats. 1987, ch. 1277, § 3, p. 4544, italics added.)

These central provisions of the Bane Act have not been substantively changed since its enactment nearly 20 years ago. Amendments since 1987 added new penalty provisions ($25,000) which may be sought in both public and private actions under the act. Of particular interest here, subdivision (g) of section 52.1 was added by amendment in response to the Court of Appeal's holding in *Boccato, supra,* 29 Cal.App.4th 1797, 1809. Subdivision (g) declares that an action brought under section 52.1 is "independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law, including, but not limited to, an action, remedy, or procedure brought pursuant to Section 51.7 [the Ralph Act]."

From its inception, the Bane Act's *purpose* has been to specifically target unlawful conduct motivated by discriminatory animus that interferes with the victim's enjoyment of statutory or constitutional civil rights. The report on Assembly Bill No. 63 (1987–1988 Reg. Sess.) by the Senate Rules Committee, 1987–1988 Regular Session (Senate Report), identifies as the "key issue" in the enactment of the Bane Act whether there should be "additional civil

and criminal penalties for crimes[1] which are committed because of the victim's racial, ethnic, religious, sexual orientation or other minority status?" (Sen. Rep., *supra*, p. 1.)

The Senate Report explained further that under the then current law, i.e., the Ralph Act, quoted above, hate crimes perpetrated through acts of *violence or threats of violence* were subject to considerably expanded civil penalties. (Sen. Rep., *supra*, p. 2.) However, due to the inadequacy of that law and the rise in hate crimes, the stated purpose of the Bane Act was to subject "the use of force *or threats* to interfere with the free exercise of one's constitutional rights" (Sen. Rep., *supra*, pp. 2–3), based on the victim's membership or perceived membership in one of the enumerated protected classes, to both civil and criminal remedies. In other words, *what the Bane Act did at its inception was to add "threats, intimidation or coercion" to the already proscribed "violence, or threats of violence" sanctioned under the Ralph Act,* where any such conduct interferes with or attempts to interfere with the statutory and constitutional rights of persons in minority or similarly protected classes, *or* who were perceived by the defendant to be members of such protected classes.

I agree with County's observation that the motivation behind the Bane Act was neither expressly nor indirectly linked to any dramatic rise in the violation of federal and state civil rights in general, and that the enactment of the statute was clearly driven by the rise in violations of such rights *motivated by hate and discriminatory animus.* That a violation of the Bane Act was originally envisioned as being circumscribed by the requirement that the defendant be shown to have acted with discriminatory intent has been repeatedly recognized in both this court's decisions and numerous decisions of the Courts of Appeal that have construed section 52.1.

We effectively acknowledged this circumscribed purpose and scope of the legislation in *Jones v. Kmart Corp., supra,* 17 Cal.4th 329, wherein we observed: "The Legislature enacted section 52.1 *to stem a tide of hate crimes.* [Citation.] The statutory language fulfills *that purpose* by providing remedies for certain misconduct that interferes with any 'right[] secured by the Constitution or laws of the United States, or . . . of this state . . .' " (*Id.* at p. 338, italics added.)

Similarly, in *In re M.S.* (1995) 10 Cal.4th 698 [42 Cal.Rptr.2d 355, 896 P.2d 1365], we bserved that the Bane Act was "enacted by the Legislature . . . in response to the alarming escalation in the incidence of hate crimes in

---

[1] Violations of court orders issued pursuant to section 52.1 are declared to be punishable as misdemeanors under the act. (See § 52.1, subd. (d); see also Pen. Code, § 422.9.)

California and the inadequacy of existing laws to deter and punish them." (*Id.* at pp. 706–707, fn. 1.) The issue in *In re M.S.* involved two Penal Code provisions (Pen. Code, §§ 422.6, 422.7) which, like their civil counterpart, section 52.1, were also enacted by the Bane Act. It is significant that each of those Penal Code sections is a criminal hate crime provision, and that each requires a showing that the violator acted with unlawful discriminatory intent insofar as victims under those sections must belong to, or be perceived by the defendant as belonging to, a minority or similarly protected class.

Likewise, the Court of Appeal in *In re Michael M., supra,* 86 Cal.App.4th 718, recognized that "The Bane Act and related California statutes dealing with *discriminatory* threats and violence are California's response to the alarming increase in hate crimes." (*Id.* at p. 725, italics added, fn. omitted.) The court explained that "In urging gubernatorial approval of the Bane Act, its author referred to a report issued by the Los Angeles County Commission on Human Relations noting the increase of *acts of racial violence and religious incidents* in Los Angeles County during 1986 and stated that the Bane Act 'addresses this problem.' " (*Ibid.,* italics added.) And the court concluded that "the principal thrust of the statute is toward preventing the intimidation of a victim . . . , when the intimidation or interference is based on the victim's actual or perceived *protected characteristic.*" (*Id.* at p. 726, italics added; see also *McMahon v. Albany School District* (2002) 104 Cal.App.4th 1275, 1294 [129 Cal.Rptr.2d 184] ["Civil Code sections 52 and 52.1, along with other statutes, were enacted in a coordinated effort to combat hate crimes"]; *In re Joshua H.* (1993) 13 Cal.App.4th 1734, 1748, fn. 9 [17 Cal.Rptr.2d 291] ["The Bane Act and related California statutes deal[] with *discriminatory* threats and violence" (italics added)]; *Bay Area Rapid Transit Dist. v. Superior Court* (1995) 38 Cal.App.4th 141, 144 [44 Cal.Rptr.2d 887] [Bane Act "provides for a *personal* cause of action for the *victim of a hate crime*" (second italics added)].)

In short, both the legislative history of section 52.1 and the manner in which the core purpose of that antidiscrimination statute has been viewed by this and other courts, since the time of its enactment, support a conclusion that intent to discriminate has long been understood as a required element of a section 52.1 violation, thereby justifying a plaintiff's eligibility for the hate crime provision's greatly expanded remedies.

## II

The Court of Appeal in *Boccato, supra,* 29 Cal.App.4th 1797, 1809, concluded that a plaintiff who brings an action under section 52.1 (the Bane Act) must be a member of one of the classes protected by Civil Code section 51.7 (the Ralph Act). Thereafter, in 2000, the Legislature enacted Assembly

Bill No. 2719 (1999–2000 Reg. Sess.) (hereafter Assembly Bill 2719) to explain that *Boccato* erred in that assumption, and to clarify that section 52.1 applies to an affected plaintiff "without regard to his or her membership in a protected class identified by its race, color, religion, or sex, among other things." (Stats. 2000, ch. 98, § 1.)

The majority opinion observes that "Assembly Bill 2719 explained that '[s]ection 52.1 of the Civil Code guarantees the exercise or enjoyment by *any individual or individuals* of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state *without regard to his or her membership in a protected class* identified by its race, color, religion, or sex, among other things.' (Italics added.) We cannot reasonably interpret this language, or the unambiguous language of section 52.1 itself, to restrict the benefits of the section to persons who are actual or perceived members of a protected class." (Majority opn., *ante*, at pp. 842–843.)

I agree that the unambiguous language of section 52.1, as amended by Assembly Bill 2719 through the addition of subdivision (g), does not on its face restrict the benefits of the section to persons who are actual or perceived members of a protected class. Nor do the findings and declarations made in connection with the enactment of Assembly Bill 2719 suggest that a plaintiff's membership in such a protected class is a requirement for bringing suit under section 52.1. (Stats. 2000, ch. 98, § 1, subd. (a)(1).)

*Boccato*'s holding—that a section 52.1 plaintiff must be an actual member of a protected class—was wrong. Even for a Ralph Act violation (Civ. Code, § 51.7), a plaintiff's *actual* membership in a protected class has never been required; it has always been understood that it is the defendant's intent and his *perception* that his victim is a member of a protected class that controls, or, to put it another way, that the defendant be shown to have acted with discriminatory intent whether or not he was factually mistaken as to his victim's actual status as a member of a protected class. To the extent a violation of the Bane Act (§ 52.1) has long been understood as requiring the same discriminatory intent as a violation of the Ralph Act, and that it is the actor's unlawful intent, and not the victim's actual membership in a protected class, that controls in establishing that requisite intent—it is not suprising that *Boccato*'s conclusion, that a section 52.1 victim must be an actual member of a protected class, cried out to the Legislature for nullification and correction.

Nonetheless, when one considers the legislative response to *Boccato*, as reflected in the language of section 52.1, subdivision (g), it is difficult to read that language as conveying anything other than that a defendant sued for a Bane Act violation need not be shown to have acted with discriminatory intent. Having amended section 52.1 with the chosen language of subdivision (g),

which provides that an action under section 52.1 is "independent of any other action, remedy, or procedure that may be available to an aggrieved individual under any other provision of law, including, but not limited to, an action, remedy, or procedure brought pursuant to section 51.7 [the Ralph Act]," it is hard to escape the conclusion that, under that literal langauge, a defendant's alleged violation of the Bane Act no longer need be shown to have been motivated by discriminatory intent. In short, I conclude the Legislature amended section 52.1 with the intent to nullify and correct *Boccato*'s holding that a victim must be an actual member of a protected class, but may have inadvertently chosen language that, on its face, can only reasonably be read as providing that defendants alleged to have violated section 52.1 need not be shown to have acted with discriminatory intent.

Since the plain wording of amended section 52.1, on its face, is not reasonably susceptible of any other construction, I am constrained to join in the majority opinion's conclusion that "in pursuing relief for those constitutional violations under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion." (Majority opn., *ante*, at p. 843.)

The Legislature, of course, is not so constrained. The Legislature can choose to revisit the matter and reevaluate whether Assembly Bill 2719's amendment of section 52.1 through the addition of subdivision (g), which now unambiguously distinguishes actions under the Bane Act from actions under the Ralph Act, is no longer faithful to the true purpose and intent to be served by these interrelated antidiscrimination provisions found side by side in the Civil Code.

### III

Under section 52.1 as now amended, whenever any person, whether or not acting under color of law, interferes by threats, intimidation, or coercion with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, a civil action may be brought under its provisions for greatly expanded compensatory damages, substantial fines ($25,000), injunctive and other appropriate equitable relief, as well as attorney fees.

Pragmatically speaking, the limitation in section 52.1 that the right being interfered with under section 52.1 be a right guaranteed by *any state or federal law or constitutional provision* is hardly a limitation at all. And although the proscribed conduct is further delineated by the requirement that

it be delivered in the form of a threat, intimidation, or coercion, it should not prove difficult to frame many, if not most, asserted violations of any state or federal statutory or constitutional right, including mere technical statutory violations, as incorporating a threatening, coercive, or intimidating verbal or written component. Without the further limitation that the violator be shown to have acted with discriminatory intent or animus, as originally intended from the time of the statute's enactment, section 52.1 will soon come to be widely viewed as a convenient civil litigation tool through which to reach a garden-variety tort defendant's deep pocket.

When one further considers that under a section 1983 cause of action the defendant must be shown to have acted under color of law, which is not a requirement for proceeding under section 52.1, and also, that under our holding today (applicable to county sheriffs), as well as our prior holding in *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 348 [70 Cal.Rptr.2d 823, 949 P.2d 920] (applicable to district attorneys), principles of sovereign immunity applicable to section 1983 suits will force many such actions to be brought instead under section 52.1 and similar state statutory counterparts, it is not difficult to envision how the statute will soon come to be abused.

In this time of economic crisis and uncertainty, the construction we are today compelled to place on the unambiguous language of amended section 52.1 could prove crippling to the coffers of local jurisdictions and municipalities. The Legislature would be well advised to take another careful look at the practical impact its recent amendment of section 52.1 will have on the scope and reach of the section's greatly expanded remedial provisions.

With the foregoing reservations in mind, I concur in the majority opinion.

Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—This case presents three issues arising from a civil rights action brought by plaintiffs David and Beatriz Venegas against the Los Angeles County Sheriff's Department, the sheriff, and three of his deputies. I join the majority in the resolution of two of those issues but not the third.

## I.

Evidence at trial established that when plaintiffs were pumping gas into their car, the three deputies stopped them on suspicion of car theft, searched the car, and then went to plaintiffs' home and searched it. The deputies arrested David for possessing a car without a visible vehicle identification

number (Veh. Code, § 10751), a misdemeanor. The district attorney did not file any criminal charge against either plaintiff.

Plaintiffs brought suit, claiming violations of federal and state civil rights laws. The trial court ruled in favor of defendants, sustaining demurrers to some causes of action and entering nonsuit on others. The Court of Appeal reversed. This court reverses in part and affirms in part the judgment of the Court of Appeal, which on remand is to decide whether the sheriff's deputies have a qualified immunity from liability on plaintiffs' federal civil rights claims. (See maj. opn., *ante,* at p. 843.) I agree on the remand.

I also agree with the majority that the Court of Appeal correctly reinstated plaintiffs' actions under Civil Code section 52.1 for interference with statutory or constitutional rights. (Maj. opn., *ante,* at p. 840.) I do, however, share Justice Baxter's concerns about the potential breadth of the statute. (Conc. opn. of Baxter, J., *ante.*)

The third and last issue is this: Does the Los Angeles County Sheriff act on behalf of the state or the county when performing law enforcement functions? Reversing the Court of Appeal on this point, the majority holds that in California, a county sheriff acts as a law enforcement officer on behalf of the state, not the county, and thus is absolutely immune from liability in a federal civil rights action. (See 42 U.S.C., § 1983 (section 1983).) (Maj. opn., *ante,* at p. 828.) I disagree.

## II.

Section 1983 provides for a damages action against "[e]very person" who, while acting under color of law, subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The federal Constitution's Eleventh Amendment grants sovereign immunity from such suits not only to each of the 50 states but also to state officers. (*Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58, 71 [105 L.Ed.2d 45, 109 S.Ct. 2304].) This is because a suit against a state officer "is no different from a suit against the State itself." (*Ibid.*) Whether this immunity applies to a particular governmental official is a question of federal law, but the "inquiry is dependent on an analysis of state law." (*McMillian v. Monroe County* (1997) 520 U.S. 781, 786 [138 L.Ed.2d 1, 117 S.Ct. 1734].)

The majority concludes that county sheriffs, when performing law enforcement functions, are state rather than county officers and thus immune from section 1983 lawsuits. (Maj. opn., *ante,* at p. 828.) Central to that conclusion is this court's decision in *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 345 [70 Cal.Rptr.2d 823, 949 P.2d 920] (*Pitts*), in which the majority held that a

county's district attorney acts on behalf of the state in prosecuting crimes, in establishing policy, and in training prosecutorial staff. Acknowledging that "*Pitts* involved district attorneys rather than sheriffs," the majority here is quick to point out that *Pitts* "relied on statutes and analysis applying to both kinds of officers" and thus applies with equal force here. (Maj. opn., *ante*, at p. 831, italics omitted.)

I agree with the majority that the provisions governing district attorneys and sheriffs are the same. (See Cal. Const., art. XI [Local Government], §§ 1, subd. (b), 4, subd. (c) [Legislature and county charters shall provide for county officers including "an elected county sheriff [and] an elected district attorney"]; Gov. Code, § 24000 ["The officers of a county are: [¶] (a) A district attorney [and] [¶] (b) A sheriff"].) Both, in my view, are county officers. In *Pitts*, I joined Justice Mosk's dissent. Relying on the same constitutional and statutory provisions just mentioned, the dissent concluded that a district attorney was an officer of the county. (*Pitts*, *supra*, 17 Cal.4th at p. 366 (dis. opn. of Mosk, J.).)

A brief observation about Justice Werdegar's concurring and dissenting opinion. Justice Werdegar joined the majority in *Pitts*, *supra*, 17 Cal.4th 340, concluding that district attorneys were state actors immune from section 1983 suit. But she reaches a contrary conclusion here, concluding as I do that sheriffs exercising their law enforcement functions are county officers. (Conc. & dis. opn. of Werdegar, J., *post*, at p. 854.) Justice Werdegar finds significant here that each "California county must pay tort judgments against its sheriff personally for acts in the scope of his or her employment, as well as judgments against the sheriff's department generally." (*Id.* at p. 857.) These obligations derive from Government Code provisions imposing liability on public entity employers, including counties, for their employees' torts and requiring them to allocate budget provisions for tort judgments. (Gov. Code, §§ 815.2, 970.8.) These statutes, however, make no distinction between county sheriffs and district attorneys as employees of a county. Thus, I cannot join Justice Werdegar's concurring and dissenting opinion, which relies on these statutes to justify her different legal conclusions about the status of county sheriffs and county district attorneys.

Justice Moreno has signed Justice Werdegar's separate opinion. Thus, three members of this court—Justice Werdegar, Justice Moreno, and I—would hold that a California county sheriff is a county officer subject to federal civil rights suit. This is also the assessment of the United States Court of Appeals for the Ninth Circuit, as expressed in two decisions resolving the exact issue here, whether a sheriff performing law enforcement functions is a state or county officer. (See *Bishop Paiute Tribe v. County of Inyo* (9th Cir. 2002) 291 F.3d 549, vacated on other grounds and remanded in *Inyo County v.*

*Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony* (2003) 538 U.S. 701 [155 L.Ed.2d 933, 123 S.Ct. 1887]; *Brewster v. Shasta County* (9th Cir. 2001) 275 F.3d 803, 807–808.) The Ninth Circuit has said it is not bound by a state court's determination that its county sheriffs are state actors because the "[q]uestions regarding section 1983 liability implicate federal, not state, law." (*Brewster, supra,* at p. 811.)

Because the Ninth Circuit considers California sheriffs performing law enforcement functions to be county officers, the majority's contrary conclusion here creates a split that results in immunizing sheriffs from section 1983 liability in actions brought in state court while exposing them to liability in identical actions filed in federal court. This effectively drives California civil rights plaintiffs with actions against a county sheriff out of our court system and into federal court. To ensure uniformity in the enforcement of federal civil rights law in both state and federal courts in California, the United States Supreme Court should decide which view is correct.

Based on my conclusion that a county sheriff exercising law enforcement functions does so for his employing county, I would affirm that part of the Court of Appeal's judgment reinstating plaintiffs' section 1983 actions against the Los Angeles County Sheriff and Los Angeles County.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in the majority opinion's discussion of the deputy sheriffs' qualified immunity defense (maj. opn., *ante,* at p. 839) and its analysis of liability under Civil Code section 52.1 (maj. opn., *ante,* at p. 841). I respectfully dissent from the decision (*id.,* at p. 828) as to the immunity of a California sheriff's office from liability for law enforcement activities under 42 United States Code section 1983 (section 1983).

The majority opinion's conclusion on state-agent immunity, that in enforcing the law California sheriffs act under the control and as agents of the State of California, rather than their counties, and thus are not to be considered "persons" subject to official-capacity suits under section 1983, is not without precedent. It draws some support from the high court's decision in *McMillian v. Monroe County* (1997) 520 U.S. 781 [138 L.Ed.2d 1, 117 S.Ct. 1734] (*McMillian*), which relied prominently on the source of authoritative control in holding Alabama sheriffs were state rather than local officers, as well as this court's decision in *Pitts v. County of Kern* (1998) 17 Cal.4th 340 [70 Cal.Rptr.2d 823, 949 P.2d 920], which applied a source-of-control analysis to reach the same conclusion about California district attorneys.

Nevertheless, I believe the better view is that California sheriffs are county officers for purposes of section 1983 liability, even when investigating possible crimes, because any tort judgment against the sheriff's department

would, as counsel for Los Angeles County (the County) conceded at oral argument, be a liability of the county rather than the state, and the control exercised by the state over sheriffs is not so pervasive and immediate as to overcome this crucial factor. The immunity of state agents from official-capacity suits under section 1983 derives from the sovereign immunity of states under the common law and the Eleventh Amendment to the United States Constitution; these sovereign immunities predate section 1983's enactment, and Congress, in enacting the civil rights law, did not intend to disturb them. (*Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58, 66–68 [105 L.Ed.2d 45, 109 S.Ct. 2304] (*Will*).) And while the degree of state control is a relevant factor under the Eleventh Amendment, it is not dispositive; rather, "the vulnerability of the State's purse" has been recognized as "the most salient factor in Eleventh Amendment determinations." (*Hess v. Port Authority Trans-Hudson Corporation* (1994) 513 U.S. 30, 48 [130 L.Ed.2d 245, 115 S.Ct. 394] (*Hess*).) The present suit for damages under section 1983 against the Los Angeles County Sheriff in his official capacity threatens neither the state's sovereign dignity nor its treasury; hence, it should not be barred under *Will*. Moreover, as explained in part II, *post*, this conclusion is consistent with the high court's most recent discussion of section 1983 state-agent immunity, in *McMillian.*

Today's decision creates a direct conflict between this court and the federal court of appeals on the immunity of California sheriffs from liability on a federal cause of action. (See *Brewster v. Shasta County* (9th Cir. 2001) 275 F.3d 803.) Both positions have some support in precedent and logic, suggesting that the anomaly of conflicting decisions is likely to endure until resolved by a higher authority. Although dependent on an understanding of sheriffs' functions under state law, immunity from section 1983 liability is of course a federal question. (*McMillian, supra,* 520 U.S. at p. 786.) The conflict created today can, therefore, be resolved effectively only by the United States Supreme Court.

## I

*Will, supra,* 491 U.S. 58, in which the high court first articulated the distinction between state immunity and local government liability at issue here, establishes a close organic link between that distinction and the doctrine of state sovereign immunity. As the court explained, Congress enacted the 1871 Civil Rights Act, of which section 1983's predecessor was a part, against a background of state immunity to damages suits under the Eleventh Amendment (for suits in federal courts) and common law sovereign immunity (for suits in state courts). From language, legislative history, and interpretive precedent the high court concluded that "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity" (*Will, supra,*

at p. 66) or to "disregard the well-established [common law] immunity of a State from being sued without its consent" (*id.* at p. 67). Moreover, because a suit against a state official in his or her official capacity is "a suit against the official's office," the *Will* court extended immunity under section 1983 to such actions, holding "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." (*Will, supra*, at p. 71.)

Official-capacity suits seeking only *injunctive* relief against state officials, on the other hand, are *not* considered actions against the state under section 1983, as they likewise would not be under traditional sovereign immunity doctrine. (*Will, supra*, 491 U.S. at p. 71, fn. 10.) Most pertinent here, the *Will* court explained that state-agent immunity under section 1983 is not inconsistent with the *municipal* liability previously recognized in *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611] (*Monell*), because "by the time of the enactment of § 1983, municipalities no longer retained the sovereign immunity they had shared with the states." (*Will, supra*, at p. 67, fn. 7.) Just as *Monell* limited municipal liability to entities that "are not considered part of the State for Eleventh Amendment purposes" (*Monell, supra*, at p. 690, fn. 54), so the immunity holding in *Will* "does not cast any doubt on *Monell*, and applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." (*Will, supra*, at p. 70.)

The immunity recognized in *Will* thus bars only section 1983 suits *seeking money damages from a state*, which are barred under the Eleventh Amendment if brought in federal court. (See also *Alden v. Maine* (1999) 527 U.S. 706, 756–757 [144 L.Ed.2d 636, 119 S.Ct. 2240] [sovereign immunity generally does not extend to municipalities, or to injunctive relief and personal-capacity actions against state officials, for in those cases "relief is not sought from the state treasury"].) Thus, in deciding whether a government official sued in his or her official capacity under section 1983 enjoys state-agent immunity, as in deciding directly under the Eleventh Amendment whether the office is an arm of the state, the court's primary consideration should be whether or not the state is obligated to pay the office's liabilities.

In *Hess, supra*, 513 U.S. 30, in holding that the Port Authority of New York and New Jersey, an entity created by compact between those two states, was not an arm of either for Eleventh Amendment purposes, the high court relied primarily on the Port Authority's financial independence, rather than on the states' control or lack thereof over it. Although an examination of how the office is controlled can be helpful to the overall inquiry, "rendering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury." (*Hess, supra*, at p. 48.) The high court considered "the vulnerability

of the State's purse [to be] the most salient factor in Eleventh Amendment determinations." (*Ibid.* [citing extensive list of lower court decisions to same effect]; *Regents of the Univ. of California v. Doe* (1997) 519 U.S. 425, 429 [137 L.Ed.2d 55, 117 S.Ct. 900] [11th Amend. immunity applies " 'when the action is in essence one for the recovery of money from the state' "]; *Lake Country Estates, Inc. v. Tahoe Planning Agcy.* (1979) 440 U.S. 391, 401 [59 L.Ed.2d 401, 99 S.Ct. 1171] ["some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability"]; *Quern v. Jordan* (1979) 440 U.S. 332, 338 [59 L.Ed.2d 358, 99 S.Ct. 1139] [11th Amend. forbids " 'retroactive award which requires the payment of funds from the state treasury' "]; *Streit v. County of Los Angeles* (9th Cir. 2001) 236 F.3d 552, 567 [potential liability of state is "most important factor in identifying an arm of the state"].) Thus, in determining whether a California sheriff's office is an arm of the state for Eleventh Amendment purposes (and therefore immune from section 1983 liability in state court, as well), we must look to whether a judgment against the sheriff's office potentially threatens California's treasury. An examination of the laws governing the Los Angeles Sheriff's Department shows a judgment against it does not have that potential.

California law defines sheriffs as elected officers of the county. (Cal. Const., art. XI [Local Government], §§ 1, subd. (b), 4, subd. (c) [Legislature and county charters shall provide for county officers including "an elected county sheriff"]; Gov. Code, § 24000 ["The officers of a county are: . . . (b) A sheriff"].) The Los Angeles County Charter (art. IV, § 12) similarly lists the sheriff as one of the "elective County officers."

In addition, a California sheriff's office is funded by the county, even as to enforcement of state criminal laws. (Gov. Code, §§ 25300 [county board of supervisors sets compensation of county officers and employees], 29430, 29435 [county required to appropriate special fund for sheriff's law enforcement activities], 29601, subd. (b)(1) [sheriff's expenses incurred in "the detection of crime" are county charges]; Los Angeles County Code, ch. 4.12 [board of supervisors sets budget for all departments and offices].)

Finally and most significantly, a California county must pay tort judgments against its sheriff personally for acts in the scope of his or her employment, as well as judgments against the sheriff's department generally. (See Gov. Code, §§ 815.2 [public employer liable in respondeat superior for torts of employees], 970.8 [public entity required to make provision in its budget to pay judgments]; *Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 717 [117 Cal.Rptr. 241, 527 P.2d 865] [sheriff is county employee for purposes of Gov. Code, § 815.2].) Indeed, as noted earlier, the County concedes as much. While the state may help to fund certain activities of the sheriff's department,

the parties have not cited, nor have I discovered, any provision of California law that would make the state legally responsible for a judgment against the Sheriff of Los Angeles County in his official capacity.

Viewing the "potential legal liability" of the state as "an indicator of the relationship between the State and its creation" (*Regents of the Univ. of California v. Doe, supra,* 519 U.S. at p. 431), California law thus clearly regards a sheriff's office not as an arm of the state but, rather, as a department of the county government. The existence of some degree of state control over sheriffs should not change this assessment. The majority opinion relies on the general supervisory authority the California Attorney General enjoys over sheriffs (Cal. Const., art. V, § 13), which includes the power to appoint a person "to perform the duties of sheriff with respect to the investigation or detection of a particular crime" (Gov. Code, § 12561). How often, if ever, this theoretical power is exercised is unclear, but in the vast majority of cases sheriffs appear to retain wide autonomy (restrained of course by general state law) over formulation of law enforcement policies and their implementation.

In *Roe v. County of Lake* (N.D.Cal. 2000) 107 F.Supp.2d 1146, 1151, footnote 13, the district court, expressing skepticism regarding the real degree of Attorney General supervision, noted that "[a]lthough county sheriffs have been frequently sued for civil rights violations in federal court, I have found no regulations which enable the Attorney General to prohibit or remedy such violations and have found no reported case in which the Attorney General has attempted to do so." Nor, in this case, has the County directed us to any such regulations or instance of the Attorney General's exercising his appointment authority under Government Code section 12561.

True, a county board of supervisors, while charged with "supervis[ing] the official conduct of all county officers," is also enjoined not to "obstruct the investigative function of the sheriff." (Gov. Code, § 25303.) But this provision simply shows that a California sheriff acts in some respects autonomously from the county board of supervisors; it does not logically make the sheriff a *state* agent. As explained in *Brewster v. Shasta County, supra,* 275 F.3d at page 810, the restriction in Government Code section 25303 "is akin to a separation of powers provision, and as such has no obvious bearing on whether the sheriff should be understood to act for the state or the county when investigating crime within his county. Merely because a county official exercises certain functions independently of other political entities within the county does not mean that he does not act *for* the county." A California sheriff, then, makes law enforcement policy for his or her own department,

which, though it operates outside direct county legislative control in some respects, is nonetheless part of the county government, both formally and financially, rather than an arm of the state.[1]

"The purpose of a *McMillian* analysis is to cull from cases seeking a federal remedy for civil rights violations, those in which the remedy would impugn state sovereignty." (*Roe v. County of Lake, supra,* 107 F.Supp.2d at p. 1151.) As discussed above, California sheriffs are elective county officers, whose compensation and budgets are set by county boards of supervisors and whose tort judgments are county liabilities. Moreover, as a county officer, a California sheriff can be removed only at an election by the county voters or, during his or her term of office, by trial on an accusation returned by a county grand jury. (Gov. Code, § 3060; *People v. Hulburt* (1977) 75 Cal.App.3d 404, 409 [142 Cal.Rptr. 190].) To paraphrase the decision in *Roe v. County of Lake, supra,* at page 1152, "[t]he deterrent effect of paying any judgment plaintiff may obtain will be felt in [Los Angeles] County. If the public is dissatisfied with [the sheriff's policies], he will either not be reelected by the voters of [Los Angeles] County or he will be impeached before a [Los Angeles] County grand jury." In sum, the Los Angeles County Sheriff is not a designated state officer under the California Constitution, nor is he appointed by the state, nor removable by the state, nor subject to the immediate day-to-day supervision of any state agency or officer. Most important, a tort judgment against the Los Angeles County Sheriff in his personal or official capacity is a liability of the County, which funds the sheriff's office, not of the state. Truly, "[i]t is hard to see how any of this will violate California's sovereignty." (*Ibid.*)

## II

*McMillian* itself is not to the contrary. The role of sheriffs and other county officers vis-à-vis state government varies from state to state; thus "no inconsistency [is] created by court decisions that declare sheriffs to be county officers in one State, and not in another." (*McMillian, supra,* 520 U.S. at p. 795.) More significantly, the *McMillian* court, though it discussed at length aspects of state classification of and control over Alabama sheriffs,[2] relied crucially on Alabama law fixing any potential responsibility for a sheriff's

---

[1] Cf. *Franklin v. Zaruba* (7th Cir. 1998) 150 F.3d 682, 685–686 (although Illinois sheriffs are not county agents for respondeat superior purposes, neither are they immune from § 1983 liability as state agents; sheriff is instead "an agent of the county sheriff's department, an independently-elected office that is not subject to the control of the county in most respects").

[2] *McMillian, supra,* 520 U.S. at pages 787–788, 790–792. Alabama law on this point differs from that of California in several notable respects. Where Alabama classifies sheriffs as members of the state executive department (see *id.* at p. 787), California classifies them as elective county officers (Cal. Const., art. XI, §§ 1, subd. (b), 4, subd. (c); Gov. Code, § 24000). Where the Alabama Legislature sets its sheriffs' salaries (*McMillian, supra,* at p. 791),

torts on the state, which was immune under the state Constitution, rather than the county. (*McMillian, supra,* at p. 789.) The *McMillian* court observed that the Alabama Constitution classified sheriffs as officers of the state's executive department and gave the state authority to remove sheriffs by impeachment. (*McMillian, supra,* at pp. 787–788.) "Critically for our case," the high court continued, the Alabama Supreme Court, relying on those constitutional provisions, had held sheriffs were state officials for tort law purposes, and the counties were therefore not liable for their torts. (*Id.* at p. 789.)

The majority opinion argues that the *McMillian* court found "critical" to its reasoning not Alabama's assignment of tort liability but, rather, "the fact that the Alabama Supreme Court had determined that the framers of the Alabama Constitution took steps to ensure that its sheriffs would be considered executive officers of the state." (Maj. opn., *ante,* at p. 836.) That reading of *McMillian* may be facially plausible, but, unlike my own, it fails to harmonize *McMillian* with the high court's previous holdings in *Will, supra,* 491 U.S. at page 70, that state-agent immunity to section 1983 liability applies "only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," and *Hess, supra,* 513 U.S. at page 48, that the state's potential legal liability for damages is "the most salient factor in Eleventh Amendment determinations." As I read *McMillian, supra,* 520 U.S. at page 789, the court concluded, from the fact Alabama· law classifies sheriffs, with respect to tort damages, as officials of the state, rather than the county, that an Alabama sheriff's office is an "arm of the state" for sovereign immunity purposes under *Hess*. A section 1983 damages suit against an Alabama sheriff in his official capacity is therefore an action seeking money damages from the state, rather than from a county, and for that reason is barred under *Will*.

The same, of course, cannot be said of California sheriffs. When sheriffs are sued personally in tort, their counties, not the state, are liable in respondeat superior. (Gov. Code, § 815.2; *Sullivan v. County of Los Angeles, supra,* 12 Cal.3d at p. 717.) Although section 1983 liability cannot be imposed on a public entity vicariously, but only for acts done pursuant to the entity's own policies or customs (*Monell, supra,* 436 U.S. at p. 694), the counties' vicarious liability for sheriffs' state law torts is nonetheless "strong evidence" (*McMillian, supra,* 520 U.S. at p. 789) that California sheriffs ordinarily act as county, not state, agents.[3] Where, as here, a sheriff is sued in his official, not personal, capacity, any judgment for damages would be a

California delegates that choice to the county boards of supervisors (Gov. Code, § 25300). And where impeachment of an Alabama sheriff may be initiated by the Governor in that state's Supreme Court (*McMillian, supra,* at p. 788), a California sheriff may be removed only on an accusation returned by a county grand jury (Gov. Code, § 3060).

[3] The majority opinion suggests discussion of county liability under Government Code section 815.2 begs the question because if the sheriff were immune so would be his or her

liability of his office, here the Los Angeles Sheriff's Department.[4] Such a judgment would thus be a liability of the County, which establishes the budget of the sheriff's department and must include therein the funds to pay judgments. (Gov. Code, §§ 970.8, 29601, subd. (b)(1); Los Angeles County Code, ch. 4.12.) Considering the liability factor held critical in *McMillian*, then, a section 1983 damages suit against a California sheriff in his official capacity is *not* an action seeking money damages from the state and is, therefore, *not* barred under *Will*.

Our decision in *Pitts v. County of Kern, supra*, 17 Cal.4th 340, does not, in my view, compel a different result. To be sure, in holding that district attorneys act for the state when prosecuting and preparing to prosecute criminal violations of state law, the court relied in part on provisions of California law equally applicable to sheriffs. (See *id.* at pp. 356–358 [discussing Cal. Const., art. V, § 13 and Gov. Code, § 25303].) But the court expressly declined to consider the tort liability factor held critical in *McMillian*, reasoning that it was of little importance because public employees and their employers enjoy broad statutory immunity, under California law, for instituting or prosecuting an action. (*Pitts v. County of Kern, supra*, at pp. 360–361, fn. 7.)

Whether or not the analysis in *Pitts v. County of Kern* was adequate to explain why the lack of potential state liability was not relevant or determinative, it distinguishes the present case, for California public employees and entities enjoy no such blanket immunity for illegal arrests and searches, the area of activity at issue here.[5] District attorneys, moreover, have a particularly strong association with the direct exercise of the state's power and are thus

---

public employer. (Maj. opn., *ante*, at p. 835.) I disagree. The question of which government entity would bear tort liability for acts of a particular government official is, in this context, a *hypothetical* one; it assumes the existence of an action in which the official is not immune from liability. But it does not make the assumption that the official is not immune *in the action at bench.*

[4] See *Will, supra*, 491 U.S. at page 71 (official-capacity suit "is not a suit against the official but rather is a suit against the official's office"). In this case, plaintiffs redundantly sued both the County's sheriff in his official capacity and its sheriff's department. (Maj. opn., *ante*, at p. 828.)

[5] The majority opinion (*ante*, at p. 836) cites Government Code sections 820.2 (discretionary acts) and 820.4 (law enforcement) as providing sheriffs potential immunity. But the former provision applies only to *basic policy decisions* committed to the legislative or executive branches of government (*Barner v. Leeds* (2000) 24 Cal.4th 676, 685 [102 Cal.Rptr.2d 97, 13 P.3d 704]), while the latter statute provides immunity only for acts taken with "due care" and exempts "false arrest or false imprisonment." It is also well established that "a governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 215 [285 Cal.Rptr. 99, 814 P.2d 1341].) The cited statutes thus indicate no broad immunity comparable to that relied upon in *Pitts v. County of Kern, supra*, 17 Cal.4th at pages 360–361, footnote 7, for unreasonable searches and seizures.

further distinguished from sheriffs, in that they prosecute state criminal offenses in the name of, and as the legal representatives of, the People of the State of California. (See *Pitts v. County of Kern, supra,* 17 Cal.4th at p. 360.) Nothing comparable to that direct link suggests a California sheriff acts as an arm of the state by apprehending criminals within his or her county.

### III

The issue that primarily divides the majority opinion from this separate opinion and from the Ninth Circuit decisions in *Brewster v. Shasta County, supra,* 275 F.3d 803, and *Streit v. County of Los Angeles, supra,* 236 F.3d 552, is one of federal, rather than California, law. I believe that under the United States Supreme Court's decisions establishing state sovereign immunity from section 1983 liability, the state's potential legal liability for torts of a local government office is a critical factor in deciding whether or not that office is an arm of the state. (*McMillian, supra,* 520 U.S. at p. 789; *Hess, supra,* 513 U.S. at p. 48; *Will, supra,* 491 U.S. at p. 70; see also *Brewster v. Shasta County, supra,* 275 F.3d at p. 808; *Streit v. County of Los Angeles, supra,* 236 F.3d at p. 562.) The majority opinion does not dispute that California law assigns potential liability for acts of a sheriff to the county rather than the state, but considers this fact irrelevant. (Maj. opn., *ante,* at p. 836.) Thus, the disputed point is the relevance and weight, *under federal law,* to be given a particular aspect of state law defining the relationship of California sheriffs to the state and county governments.

Until this question is resolved, federal district courts in California will be required to follow one rule, permitting section 1983 suits against sheriffs' departments, while California superior courts will be required to follow the opposite rule, prohibiting such actions. I urge the United States Supreme Court to consider removing this anomaly by deciding the underlying issue of federal law.

Moreno, J., concurred.