[No. B186764. Second Dist., Div. Seven. July 31, 2007.]

DAVID VENEGAS et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## Counsel

Robert Mann and Donald W. Cook for Plaintiffs and Appellants.

Franscell, Strickland, Roberts & Lawrence, David D. Lawrence, Jin S. Choi and Scott E. Caron for Defendants and Respondents County of Los Angeles, Los Angeles County Sheriff's Department, Sheriff Lee Baca, Deputy Sheriffs Michael Gray, Robert Harris and Thomas Jimenez.

Revere & Wallace, Frank Revere, Gabriel Dermer and Annie Kyureghian for Defendants and Respondents City of Vernon, Vernon Police Department and Detective Steve Wiles.

## Opinion

**JOHNSON, Acting P. J.**—In this appeal we address a question of first impression in California. Does the doctrine of qualified immunity, which applies to federal civil rights actions under 42 United States Code section 1983, also apply to California civil rights actions under Civil Code section 52.1? We hold the doctrine of qualified immunity does not apply to plaintiffs' cause of action under Civil Code section 52.1. The County of Los Angeles (County) and Robert Harris having argued no other grounds for immunity, we reverse the summary adjudication in their favor because there are triable issues of fact as to whether Harris interfered by threats, intimidation or coercion with plaintiffs' exercise or enjoyment of their rights under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution.

We affirm the summary adjudications in favor of the City of Vernon and Officer Wiles on plaintiffs' cause of action under Civil Code section 52.1 and in favor of all defendants on the cause of action for battery. We reverse the summary adjudication as to all defendants on plaintiffs' negligence cause of action.

### FACTS

The Taskforce for Regional Autotheft Prevention (TRAP) was an inter-agency task force run by the County of Los Angeles Sheriff's Department to

facilitate multijurisdictional car theft investigations. Defendant Steven Wiles, a police officer for defendant City of Vernon, was assigned to the southeast TRAP. At approximately 7:00 p.m. Wiles was in a staging area in Bellflower with other TRAP members preparing to execute a search warrant for a nearby residence belonging to Ricardo Venegas, the older brother of plaintiff David Venegas. Wiles had information Ricardo was involved in switching vehicle identification numbers (VIN's) on stolen cars and fraudulently getting titles at the Temecula Department of Motor Vehicles (DMV). Wiles had a photograph of Ricardo and a description of him as 5 feet 11 inches tall, weighing 210 pounds.

While the TRAP team was waiting in the staging area, a Mercury Cougar with no license plates drove past. The driver was a woman, later identified as plaintiff Beatriz Venegas. The male passenger in the car, later identified as Beatriz's husband, David, appeared to some TRAP officers to resemble his brother Ricardo. The TRAP officers followed the car until it stopped at a gas station about a block away. According to Wiles, Los Angeles County Sheriff's Deputies Michael Gray and Robert Harris were the first officers to arrive at the gas station and contact David.

Beatriz went inside the gas station to pay for the gas while David stood outside by the car to pump the gas. Two cars from the TRAP pulled into the gas station and blocked the Cougar. Four officers in casual clothes, but with badges around their necks, approached David and asked him who he was and whether he knew a Ricardo Venegas. David told them Ricardo was his brother. Other officers approached Beatriz when she came out of the gas station building and detained her apart from David.

According to Wiles, David became irate at the officers' questioning, using profanities, and inquiring why he was not free to go. According to Wiles's testimony, because of David's belligerent attitude he was handcuffed for reasons of officer safety. Gray admitted being at the gas station and participating in the decision to detain David.

Wiles spoke with David while other officers searched the Cougar for its VIN. In response to Wiles's questions about the Cougar, David told him he had just bought the car in Los Angeles; it was a salvaged vehicle; he and Beatriz had gone to the DMV and were told they had to go to the California Highway Patrol to have a VIN issued. Officer Peloquin from the Los Angeles Police Department was Wiles's partner on the team. Peloquin spent about 10 minutes looking for a public VIN on the Cougar and could not find one. He

did, however, inform Wiles he found a partial VIN on the car's engine. Meanwhile, another officer searched the glove box and under the seats of the car. This officer found documents in the glove box consisting of a VIN consistent with the partial VIN on the car's engine, an odometer disclosure statement, a bill of sale, and a blank application for registration. The bill of sale and odometer disclosure statement listed Beatriz Venegas as the buyer and gave the date of sale as two weeks earlier.

After the officers learned the car had no public VIN, they decided to impound the car to determine whether it was stolen. According to Peloquin, the fact the partial VIN on the engine matched the VIN as stated on the odometer disclosure statement was not conclusive evidence for him the car was not stolen because the engine and transmission could have been replaced. David admitted to Wiles he knew the public VIN was missing. He told Wiles the person who sold him the car told him it was a salvaged vehicle. Wiles testified at that point he did not know whether the paperwork found in the vehicle was fraudulent or legitimate. Although Beatriz produced a California driver's license, David had no driver's license or California identification card in his possession. Beatriz produced David's employee badge but some of the officers believed it did not positively identify David as not being Ricardo. Wiles, however, admitted he knew within minutes David, who was only five feet six inches tall, was not Ricardo.

The evidence shows David or Beatriz told the officers David had his identification at home, only about a minute and a half from the gas station. Wiles asked David to sign an entry and search waiver form so officers could go to his home and pick up his identification. At first David refused to give consent, but then gave his verbal consent for the officers to accompany Beatriz to their home to retrieve his identification. David testified he and Beatriz were told the officers would not search their home.

According to Wiles it was necessary to go to David's home to obtain his identification because a positive identification "is to be made through a valid license where we can run the name through dispatch and find out who he is." Wiles testified neither he nor any of the other officers ran David's name through the computer system, even though, he conceded, they could have done so and found out whether the person described in the system fit the description of the person they had in front of them.

Wiles was at the gas station for about 10 to 15 minutes before his immediate supervisor told him to leave to serve the search warrant at Ricardo's home. At that point the officers placed David, still handcuffed, in the back of Harris's van. Wiles admitted that while at the gas station, Beatriz was not free to leave.

According to El Segundo Police Officer Rudy Kerkhof, also assigned to the TRAP team, someone told him the Venegases had consented to a search of their home. He testified it was possible he was the one who obtained Beatriz's signature on a written entry and search waiver form, which had been filled in by another officer and handed to him. The waiver form provided in pertinent part Beatriz "hereby grant[s] full and unconditional authority to the Los Angeles County Sheriff's Department to enter those [above described] premises to conduct a search for *identification—C.D.L.—*and to conduct any related investigation in any related criminal or non-criminal law enforcement matter." (Italics added.) This statement was preprinted on the form except for the italicized portion which was handwritten by Harris on blank lines contained on the form. Kerkhof transported Beatriz to her home. According to Beatriz, the officers said she could not go into her home alone to retrieve her husband's identification.

After arriving at her home with Kerkhof, Beatriz retrieved David's California identification card from their bedroom and brought it along with David's wallet to the officer in her living room. The officer took David's wallet from her and searched it. Two other police officers arrived at her home. Beatriz sat with Kerkhof on the couch in the living room while the other two officers searched the entire house including the bedroom of the Venegases' minor son, Vincent. While David was sitting in the van with Harris, Harris received a radio call stating the officers had verified David's identification.

About an hour after Wiles left the gas station, he received a radio call from Harris informing him David's identification had been verified and that David was on felony probation for drug dealing. Wiles decided at that point David should be arrested for violation of Vehicle Code section 10751, subdivision (a), a misdemeanor committed in his presence,[1] and for violating his probation under Penal Code section 1203.2.

---

[1] Vehicle Code section 10751 provides in pertinent part: "(a) No person shall knowingly buy, sell, offer for sale, receive, or have in his or her possession, any vehicle . . . from which any serial or identification number, including, but not limited to, any number used for registration purposes, that is affixed by the manufacturer to the vehicle or component part . . . has been removed, defaced, altered, or destroyed, unless the vehicle or component part has attached thereto an identification number assigned or approved by the department in lieu of the manufacturer's number."

According to Kerkhof, he had been in the Venegas home about 10 minutes when Harris arrived with David. Harris brought David into the house and sat him on the couch with Beatriz and Kerkhof. Beatriz was crying. For 30 minutes, Harris participated in the search of the home with two other officers. Neither David nor Beatriz was ever able to ascertain the identity of the two officers who searched their home with Harris. According to Venegas, the officers searched the home like they were looking for drugs. Beatriz testified she was not claiming the officers damaged anything in her home. She further stated she did not question the officers or protest the search because she was scared.

Harris took David to the Lakewood Sheriff's station, where he was booked into custody at 8:55 p.m. on the Vehicle Code and probation violation charges. Beatriz was detained for about two hours, but was not charged with any offense.

The next day, Gray partially dismantled the Cougar by removing six bolts and found a confidential full VIN, which matched the VIN as stated in the documents found in the glove box. Given this information, Wiles directed David be released from custody but he was not released until two days later. No charges were filed against David arising out of the incident.

### PROCEEDINGS BELOW

David and Beatriz and their minor son Vincent brought an action against the County of Los Angeles and the Los Angeles County Sheriff's Department, Sheriff Lee Baca, former Sheriff Sherman Block and three sheriff's deputies, Harris, Gray and Jimenez. The suit also named the City of Vernon, the Vernon Police Department and Officer Wiles, and the City of El Segundo, whose officer, Kerkhof, was part of the TRAP team but not named as a defendant.[2] Plaintiffs' complaint alleged causes of action for violations of their federal and state civil rights under 42 United States Code section 1983 (section 1983) and Civil Code section 52.1 as well as various state law torts arising out of the detention and arrest of David and Beatriz by members of TRAP and the subsequent search of plaintiffs' home by sheriff's deputies. The trial court ruled in favor of defendants on all but two claims prior to trial, sustaining demurrers as to some causes of action and granting summary adjudication on others.

---

[2] The City of El Segundo did not join in the motion for summary judgment and is not a party to this appeal.

When the case went to trial, plaintiffs presented their case-in-chief claiming their detentions, the search and seizure of their car and the subsequent search of their home violated their Fourth Amendment rights to be free from unreasonable search and seizure. At the close of plaintiffs' evidence the trial court granted defendants' motion for nonsuit, finding the officers had "acted reasonably by any objective standard" and therefore were entitled as a matter of law to immunity from any civil liability. The court explained, "The situation was there was an ongoing investigation of Mr. Venegas' brother. His sister-in-law . . . had been arrested the day before. When Mr. Venegas was stopped there were no VINs on the car. I've seen the picture. He looks very, very similar to his brother, at least as far as I'm concerned. He was belligerent and noncooperative with the officers. He had no California driver's license or I.D. So under the circumstances I think there was more than enough probable cause. I thought the officers acted reasonably by any objective standard. So I'm going to grant the nonsuit at this time."

We reversed the judgment of nonsuit in *Venegas I*,[3] concluding the evidence in plaintiffs' case-in-chief raised factual issues regarding defendants' entitlement to qualified immunity that were properly determined by the jury, not the trial court. We also held the trial court erred in sustaining without leave to amend the demurrers of the Los Angeles County Sheriff's Department and Sheriff Baca to plaintiffs' federal civil rights claims under the Eleventh Amendment to the United States Constitution, holding that, when engaged in a criminal investigation, the sheriff is acting as an agent of the county, not the state, and therefore is a "person" under section 1983. In addition, we reversed the trial court's order sustaining without leave to amend the demurrer to plaintiffs' claim under Civil Code section 52.1 finding plaintiffs had adequately stated a cause of action under this provision.

The Supreme Court granted the petition for review filed by the County, Sheriff Baca and his three deputies and reversed in part and affirmed in part our judgment.

In a closely divided decision, the court disagreed with our reasoning as to the sheriff's liability under section 1983. The court held the trial court had properly sustained the demurrers of the County and Sheriff Baca to plaintiffs' section 1983 action, concluding a county sheriff engaged in a criminal investigation acts as a law enforcement officer on behalf of the state, not the county, and thus is absolutely immune from liability in a federal civil rights

---

[3] *Venegas v. County of Los Angeles* (Dec. 23, 2002, B148398) (superseded by grant of review Apr. 16, 2003 (S113301)) (*Venegas I.*).

action: "California sheriffs act as state officers while performing state law enforcement duties such as investigating possible criminal activity."[4]

The court affirmed our determination plaintiffs had adequately pleaded a cause of action against the County and Baca under Civil Code section 52.1 for interference with statutory or constitutional rights: "[I]n pursuing relief for [alleged unconstitutional search and seizure violations extending far beyond ordinary tort claims] under section 52.1, plaintiffs need not allege that defendants acted with discriminatory animus or intent, so long as those acts were accompanied by the requisite threats, intimidation, or coercion."[5]

Finally, with respect to the sheriff's deputies' entitlement to qualified immunity from civil liability under 42 United States Code section 1983, the Supreme Court explained under *Saucier v. Katz*,[6] "despite a possible Fourth Amendment violation, officers still must be granted immunity 'for reasonable mistakes as to the legality of their actions.' [Citation.]"[7] "*Saucier* set forth the following framework for ruling on a claim of qualified immunity: First, accepting the plaintiff's allegations as true, was a constitutional right violated? If so, was the right so well established that it would be clear to a reasonable officer that his conduct was unlawful in the circumstances?"[8] Concerned we may have misapplied governing legal principles, the court remanded the case for reconsideration of the issue of the officers' qualified immunity.[9]

Upon remand from the Supreme Court we only addressed the question the high court directed us to reconsider: whether the sheriff's deputies were entitled to qualified immunity from civil liability under 42 United States Code section 1983.[10] We held the deputies were entitled to qualified immunity because (1) "[the deputies'] initial detention and questioning of David and Beatriz and the search and impounding of their car violated no constitutional rights" and (2) "[t]he continued detention of Beatriz and the warrantless search of the

---

[4] *Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 839 [11 Cal.Rptr.3d 692, 87 P.3d 1] (*Venegas II*). The Supreme Court denied the separate petition for review filed by the Vernon Police Department and Officer Wiles.

[5] *Venegas II, supra,* 32 Cal.4th at page 843.

[6] *Saucier v. Katz* (2001) 533 U.S. 194, 201–202 [150 L.Ed.2d 272, 121 S.Ct. 2151].

[7] *Venegas II, supra,* 32 Cal.4th at page 840.

[8] *Venegas II, supra,* 32 Cal.4th at page 840.

[9] *Venegas II, supra,* 32 Cal.4th at page 840. In our initial opinion we reversed the trial court's orders sustaining demurrers to David's claim for battery and to portions of all three plaintiffs' claims for negligence. We affirmed orders granting summary adjudication and sustaining demurrers that fully resolved in defendants' favor the civil rights claims based on alleged violations of plaintiffs' Fifth Amendment rights. Because no issues relating to these additional claims were addressed in *Venegas II,* our initial decision remains determinative on those matters. (See *Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 709, fn. 12 [238 Cal.Rptr. 780, 739 P.2d 140].)

[10] *Venegas II, supra,* 32 Cal.4th at page 843.

Venegas home, even if unlawful, were 'reasonable mistakes'" under *Saucier v. Katz*.[11] Accordingly we ordered: "The judgment is reversed as to plaintiffs' cause of action under Civil Code section 52.1 . . . , as set forth in [*Venegas II*] and as to the causes of action for battery . . . and negligence . . . as set forth in our initial decision. [*Venegas I*.] In all other respects the judgment is affirmed. The matter is remanded to the trial court for further proceedings consistent with the Supreme Court's decision, this opinion and those portions of our initial decision that have not otherwise been reversed or modified."[12]

When the case returned to the trial court defendants City of Vernon, Vernon Police Department, Officer Wiles, County of Los Angeles and Deputy Harris moved for summary judgment on the remaining causes of action: violation of constitutional rights under Civil Code section 52.1, battery and negligence. The court granted the motion "in its entirety as to all defendants."[13] Plaintiffs filed a timely notice of appeal.

## DISCUSSION

I. *THE COUNTY AND DEPUTY HARRIS ARE NOT ENTITLED TO SUMMARY ADJUDICATION ON THE CIVIL CODE SECTION 52.1 CAUSE OF ACTION FOR VIOLATION OF THE PLAINTIFFS' CONSTITUTIONAL RIGHTS.*

█ Section 52.1, subdivision (a) provides for injunctive or other equitable relief against "a person or persons, whether or not acting under color of law, [who] interferes by threats, intimidation, or coercion, . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."[14] Subdivision (b) of section 52.1 states "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States [or of this state] has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute or prosecute . . . a civil action for damages . . . ."

In *Venegas III* we held the officers' initial detention and questioning of David and Beatriz and the search and impounding of their car did not violate their rights under the United States Constitution. This ruling necessarily means Deputy Harris's involvement in the initial detention and questioning of

---

[11] See *Saucier v. Katz, supra*, 533 U.S. at page 206.

[12] *Venegas v. County of Los Angeles* (July 28, 2004, B148398) (nonpub. opn.) (*Venegas III*).

[13] The trial court's minute order states Sheriff Baca and Deputies Gray and Jimenez had previously been dismissed from the case. Their dismissal is not an issue in this appeal.

[14] Civil Code section 52.1, subdivision (a).

David and Beatriz and the search and impounding of their car did not violate their rights under the California Constitution because plaintiffs have not accused Harris of violating any state constitutional right which is separate and distinct from their federal protections.[15]

As to the continued detention of Beatriz and the warrantless search of plaintiffs' home, we held Harris "possibly" violated plaintiffs' Fourth Amendment rights but at most he made " ' "reasonable mistakes as to the legality of [his] actions" ' " entitling him to qualified immunity from liability under 42 United States Code section 1983.[16]

The County and Harris argue their qualified immunity from liability under 42 United States Code section 1983 should extend to plaintiffs' constitutional claims under Civil Code section 52.1.[17] We have found no case in which a defendant who violated a statute or constitutional provision was granted immunity in a section 52.1 action under federal qualified immunity standards. Nevertheless, the County and Harris urge us to judicially create such an immunity. They argue doing so would be consistent with the legislative history of section 52.1 and sound public policy. For the reasons explained below we find nothing in the legislative history that suggests the Legislature intended section 1983-style immunity to apply to actions under section 52.1. As to public policy we note there are statutory immunities which apply to the actions of police officers. If, as the County and Harris suggest, these immunities do not cover the circumstances in the present case, then it is up to the Legislature to decide whether to amend the law; it is not the role of the courts to rewrite it.[18]

A. *Background—Qualified Immunity Under 42 United States Code Section 1983.*

Title 42 United States Code section 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any

---

[15] See *Reynolds v. County of San Diego* (9th Cir. 1996) 84 F.3d 1162, 1170–1171, dismissing a Civil Code section 52.1 cause of action where there was no violation of the federal Constitution and the plaintiff did not allege violation of the state Constitution separate and distinct from federal rights.

[16] See *Venegas II, supra,* 32 Cal.4th at page 840; *Saucier v. Katz, supra,* 533 U.S. at page 201.

[17] Our opinions in *Venegas I* and *III* and the Supreme Court's opinion in *Venegas II* were limited to the question whether the complaint stated a cause of action under section 52.1. The issue of qualified immunity raised in the present appeal was not before us or the Supreme Court.

[18] See *Venegas II, supra,* 32 Cal.4th at page 850 (conc. opn. of Baxter, J.).

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

The plain text of 42 United States Code section 1983 creates no exceptions for special classes of persons such as police officers or executive officials nor is there anything in the United States Constitution which expressly mandates any form of immunity to persons who might otherwise be liable under the statute. A literal reading of section 1983 suggests a police officer or government official, like any other person, is subject to liability for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.[19]

*Pierson v. Ray*[20] was the first United States Supreme Court case to apply the doctrine of qualified immunity to a cause of action under 42 United States Code section 1983. In *Pierson*, the Black plaintiffs alleged their federal civil rights were violated when they were arrested for attempting to use a bus station's "Whites only" waiting room in Jackson, Mississippi. The defendant police officers argued under common law rules they should not be held liable "if they acted in good faith and with probable cause in making an arrest under a statute that they believed to be valid."[21] The Supreme Court agreed, stating: "Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the subject is later proved. . . . Although the matter is not entirely free from doubt, . . . the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional, on its face or as applied."[22] Therefore, the court held, "the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983."[23] The cause was remanded for a new trial on the officers' good faith belief arresting the preachers was constitutional.

The principle of qualified immunity has gone through several iterations since it was first applied in *Pierson.* Today qualified immunity shields a public officer from an action for damages under 42 United States Code section 1983

---

[19] See Note, *Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation* (1985) 95 Yale L.J. 126, 129, footnote 10 (Qualified Immunity for Government Officials).

[20] *Pierson v. Ray* (1967) 386 U.S. 547 [18 L.Ed.2d 288, 87 S.Ct. 1213].

[21] *Pierson v. Ray, supra,* 386 U.S. at page 555.

[22] *Pierson v. Ray, supra,* 386 U.S. at page 555.

[23] *Pierson v. Ray, supra,* 386 U.S. at page 557.

unless the officer has violated a "clearly established" constitutional right.[24] By "clearly established" the court means "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[25] In other words, an officer is not liable for his "reasonable mistakes."[26]

For our purposes the significance of qualified immunity under 42 United States Code section 1983 is that the doctrine is entirely a creation of the United States Supreme Court.[27] Qualified immunity is "without textual basis in either the Constitution or statute."[28] Instead, "[t]he high court looks to whether 'an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871,' and then considers whether Congress intended to incorporate that immunity into section 1983."[29]

### B. Background—Statutory Immunity Under Civil Code Section 52.1

Civil Code section 52.1 was enacted in 1987 as part of a comprehensive legislative package to combat hate crimes.[30] As our Supreme Court explained in *Jones v. Kmart Corp.*, "[t]he statutory language fulfills that purpose by providing remedies for certain misconduct that interferes with any 'right[] secured by the Constitution or laws of the United States, or . . . of this state . . . .' "[31] Section 52.1 differs from section 1983 in two important ways. There is no "state action" requirement in section 52.1; the statute applies to private actors as well as government agents. Furthermore, liability is limited to violations of constitutional or statutory rights accomplished by "threats, intimidation, or coercion."

As originally enacted the Bane Act did not provide for a damages remedy. In 1990 section 52.1 was amended to allow "any individual" whose exercise or enjoyment of constitutional or statutory rights has been interfered with by "threats, intimidation, or coercion" to sue the perpetrator for damages.[32]

---

[24] *Saucier v. Katz, supra,* 533 U.S. at page 201.

[25] *Saucier v. Katz, supra,* 533 U.S. at page 202.

[26] *Saucier v. Katz, supra,* 533 U.S. at page 205.

[27] *Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 755 [63 Cal.Rptr.2d 842, 937 P.2d 273].

[28] Note, *Qualified Immunity for Government Officials, supra,* 95 Yale L.J. at page 129.

[29] *Asgari v. City of Los Angeles, supra,* 15 Cal.4th at pages 755–756.

[30] Statutes 1987, chapter 1277, section 3, page 4544, commonly referred to as "the Bane Act"; *Jones v. Kmart Corp.* (1998) 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844, 949 P.2d 941].

[31] *Jones v. Kmart Corp., supra,* 17 Cal.4th at page 338.

[32] Civil Code section 52.1, subdivision (b), as amended by Statutes 1990, chapter 392, section 1, page 1749, enacting Assembly Bill No. 2683 (1989–1990 Reg. Sess.).

The issue of immunity from damages is not discussed in the legislative history of the amendment.

Court of Appeal opinions which have addressed the issue of immunity from damages under Civil Code section 52.1 have done so by looking to the statutory immunities applicable to government tort claims generally. In *O'Toole v. Superior Court* the Court of Appeal held police officers sued under section 52.1 were immune from liability for violating plaintiffs' free speech rights by reason of Government Code section 820.6 which provides a police officer is not civilly liable for enforcing an unconstitutional statute or regulation if the enforcement is in good faith and without malice.[33] In *Gillan v. City of San Marino* the court held police officers sued under section 52.1 for false arrest were not immune from liability under Government Code section 821.6, which provides a public employee is not liable for instituting or prosecuting a judicial or administrative proceeding, nor under Government Code section 820.2, which provides a public employee is immune from liability for discretionary acts within the scope of his or her employment.[34]

The cases cited by the County and Harris did not apply the qualified immunity doctrine to claims under Civil Code section 52.1. In *Ritschel v. City of Fountain Valley* the court did not affirm the judgment for defendants because they made a "reasonable mistake" but because "plaintiff did not meet his burden of proof . . . to show defendants' conduct violated his rights under state law."[35] Similarly, in *Reynolds v. County of San Diego* the court affirmed the trial court's summary judgment on plaintiffs' section 52.1 cause of action "because there is . . . no conduct specified which constitutes a state constitutional violation" and, therefore, "there is no conduct upon which to base a claim of liability under section 52.1."[36]

### C. *The Doctrine of Qualified Immunity Does Not Apply to Claims Under Civil Code Section 52.1*

■ The case law examples discussed above reinforce the conclusion we reached in *Ogbron v. City of Lancaster*: "The doctrine of qualified governmental immunity is a federal doctrine that does not extend to state tort claims against government employees."[37]

---

[33] *O'Toole v. Superior Court* (2006) 140 Cal.App.4th 488, 509 [44 Cal.Rptr.3d 531].

[34] *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1050–1051 [55 Cal.Rptr.3d 158].

[35] *Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 124–125 [40 Cal.Rptr.3d 48].

[36] *Reynolds v. County of San Diego, supra,* 84 F.3d at pages 1170–1171.

[37] *Ogborn v. City of Lancaster* (2002) 101 Cal.App.4th 448, 460 [124 Cal.Rptr.2d 238].

Even so, the County and Harris argue the legislative history of Civil Code section 52.1 and the similarities between it and 42 United States Code section 1983 should lead us to the conclusion qualified immunity applies to claims under section 52.1. For the reasons discussed below, we disagree.

As previously noted, the legislative history of Assembly Bill No. 2683 (1989–1990 Reg. Sess.), which added the remedy of damages to Civil Code section 52.1, makes no mention of immunity whether created by statute or court decision.

The County and Harris, however, purport to find a legislative intent to incorporate section 1983-style qualified immunity into Civil Code section 52.1. They base their argument on the undisputed fact section 52.1 was modeled after the Massachusetts Civil Rights Act[38] and in 1989, a year before section 52.1 was amended to allow for damages, the Massachusetts Supreme Judicial Court held claims against public officials under the Massachusetts Civil Rights Act are subject to some extent to the qualified immunity the officials would enjoy under 42 United States Code section 1983.[39] This decision by the Massachusetts high court was, in turn, based on its previous decision that in enacting the Massachusetts Civil Rights Act " 'the Legislature intended to provide a remedy . . . coextensive with 42 U.S.C. § 1983.' "[40]

It is true California statutes modeled on statutes of other states are often given the construction placed on them by the courts of the originating states in opinions handed down before the adoption of the California statute.[41] Indeed, in interpreting one of the criminal statutes enacted as part of the Bane Act our Supreme Court relied in part on the Massachusetts Supreme Judicial Court's interpretation of the corresponding provision of the Massachusetts Civil Rights Act.[42]

■ Judicial interpretations of the model statute, however, are by no means binding on California courts. On the contrary, although our Supreme

---

[38] *Jones v. Kmart, supra,* 17 Cal.4th at page 335.

[39] *Duarte v. Healy* (1989) 405 Mass. 43 [537 N.E.2d 1230, 1232]. In *Duarte,* a firefighter challenged his employer's use of a mandatory drug screening test on various federal and state grounds. The court held the official who adopted the urinalysis policy was entitled to qualified immunity. The court held: "public officials are not liable under the [Massachusetts] Civil Rights Act for their discretionary acts, unless they have violated a right under Federal or State constitutional or statutory law that was 'clearly established' at the time." (*Id.,* 537 N.E.2d at p. 1232.) The court noted it was not considering "whether it is appropriate under the [Massachusetts] Civil Rights Act to adopt all of the current Supreme Court precedent under § 1983." (*Ibid.*)

[40] *Duarte v. Healey, supra,* 537 N.E.2d at page 1232.

[41] *In re M.S.* (1995) 10 Cal.4th 698, 713, footnote 5 [42 Cal.Rptr.2d 355, 896 P.2d 1365].

[42] *In re M.S., supra,* 10 Cal.4th at page 713 and footnote 5.

Court followed the Massachusetts high court's interpretation of one provision of its civil rights act,[43] in a subsequent case our Supreme Court declined to follow the Massachusetts high court's interpretation of another such provision. In the latter case our Supreme Court held the mere fact this Massachusetts decision was handed down prior to the State of California's adoption of the Bane Act was insufficient evidence our Legislature intended to adopt the Massachusetts court's interpretation.[44] The court noted: "[T]he rule of deference to another state's interpretation of a statute that provided a model for a California statute 'establishes . . . only a presumption of legislative intent. Moreover, even when the presumption properly operates it does not compel adoption of the judicial construction of the other jurisdiction's statute.' [Citation.]"[45] In this instance, the court concluded, "Section 52.1's language simply does not support [the] construction" the Massachusetts court gave the Massachusetts law.[46]

We believe it is too much of a stretch to presume our Legislature intended to incorporate the doctrine of qualified immunity into Civil Code section 52.1 on the basis of a Massachusetts decision holding qualified immunity applies to the law on which section 52.1 was modeled. It is one thing to look to the decisions of the courts of the model state interpreting the meaning of a term used in the model statute and rebuttably presume our Legislature intended to give the same term the same meaning.[47] It is quite another thing to look to the decisions of the courts of another state adding a "judicial gloss"[48] of common law immunity to the terms of the model statute and presume our Legislature intended to give the same judicial gloss of common law immunity to the California statute. The train of reasoning is stretched even further in this case because we would be applying a judicial gloss of common law immunity to the California statute based on the judicial gloss of common law immunity the Massachusetts court applied to the Massachusetts statute based in turn on a judicial gloss of common law immunity the United States Supreme Court applied to 42 United States Code section 1983. Moreover, we would be doing so more than 40 years after the California Supreme Court abolished the common law rules of governmental immunity from tort liability.[49] Thus, while the

---

[43] *In re M.S., supra,* 10 Cal.4th at page 713 and footnote 5.

[44] *Jones v. Kmart, supra,* 17 Cal.4th at pages 336–337.

[45] *Jones v. Kmart, supra,* 17 Cal.4th at page 337.

[46] *Jones v. Kmart, supra,* 17 Cal.4th at page 337.

[47] See discussion at page 1244, *ante.*

[48] *Asgari v. City of Los Angeles, supra,* 15 Cal.4th at page 755.

[49] *Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211, 213 [11 Cal.Rptr. 89, 359 P.2d 457].

Massachusetts court's decision in *Duarte v. Healy* is relevant to our interpretation of section 52.1 it is not conclusive of our Legislature's intent nor even persuasive, as we shall explain.[50]

The chief defect of *Duarte v. Healy* is its leap in logic that because the Massachusetts Legislature " 'intended to provide a remedy . . . coextensive with 42 U.S.C. § 1983' "[51] it also intended to provide immunity from that remedy coextensive with section 1983. The court does not explain why it believes the latter follows from the former nor does it explain why an action for a violation of constitutional or statutory rights by a government actor should not be governed by the same statutory immunities available to other government tortfeasors under the Massachusetts Tort Claims Act.[52]

Finally, there is abundant evidence showing that if the California Legislature wanted to immunize police officers from liability for unreasonable searches based on reasonable mistakes it knew how to say so. For example, in Penal Code section 847, subdivision (b)(1) the Legislature provided "[t]here shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer" who makes an unlawful arrest if the officer "at the time of the arrest, had reasonable cause to believe the arrest was lawful." In Civil Code section 43.55, subdivision (a) the Legislature provided immunity to "any peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant."

■ For the reasons discussed above, we hold qualified immunity of the kind applied to actions brought under 42 United States Code section 1983 does not apply to actions brought under Civil Code section 52.1. Because the County and Harris did not base their motion for summary adjudication of the section 52.1 cause of action on any immunity other than qualified immunity under section 1983, and have argued no other ground on appeal, we have no occasion to determine whether a statutory immunity might apply here. We

---

[50] The County and Harris also claim the Supreme Judicial Court of Maine held in *Jenness v. Nickerson* (Me. 1994) 637 A.2d 1152 "the qualified immunity analysis under section 1983 also applies to the [Maine Civil Rights Act]" which is also modeled on the Massachusetts statute. This is not correct. What the Maine court actually said was: "*Plaintiffs agree . . . that the qualified immunity analysis under section 1983 also applies to the [Maine Civil Rights Act].*" (*Id.* at p. 1159, italics added.) Thus qualified immunity was not an issue in *Jenness.*

[51] *Duarte v. Healy, supra,* 537 N.E.2d at page 1232, quoting *Batchelder v. Allied Stores Corp.* (1985) 393 Mass. 819 [473 N.E.2d 1128, 1131].

[52] See Massachusetts General Laws, chapter 258.

determine only that the County and Harris were not entitled to summary adjudication on the section 52.1 cause of action based on the doctrine of qualified immunity applicable to federal civil rights actions under section 1983.

> D. *Triable Issues of Fact Exist as to Whether Deputy Harris Interfered with Plaintiffs' Fourth Amendment Rights Through "Threats Intimidation or Coercion."*

The question whether Deputy Harris interfered with plaintiffs' Fourth Amendment rights through "threats, intimidation, or coercion" in connection with the search of their home has never been addressed in the trial court. The plaintiffs' Civil Code section 52.1 cause of action had been dismissed on demurrer and therefore "threats, intimidation, or coercion" were not issues at the trial. When the cause was remanded to the trial court following our decision in *Venegas III* the County and Harris did not move for summary judgment on the ground plaintiffs could not prove "threats, intimidation, or coercion" in connection with the search of their home. Therefore a triable issue of fact exists as to this element of plaintiffs' section 52.1 cause of action.

> II. *THE TRIAL COURT PROPERLY GRANTED SUMMARY ADJUDICATION TO THE CITY OF VERNON AND DETECTIVE WILES BECAUSE THE UNDISPUTED EVIDENCE SHOWS THEY DID NOT VIOLATE ANY OF PLAINTIFFS FEDERAL OR STATE RIGHTS.*

The city and Detective Wiles were entitled to summary adjudication on the Civil Code section 52.1 cause of action because the undisputed evidence showed Wiles did not violate any of plaintiffs' constitutional rights.

In *Venegas III* we held the actions of the officers at the gas station, including Wiles's, were justified under established law, violating none of David's or Beatriz's federal constitutional rights. Plaintiffs have not alleged Wiles violated any state constitutional right separate and distinct from their federal rights. Although before leaving the gas station Wiles assured both David and Beatriz their home would not be searched if they agreed to permit officers to go there to retrieve David's identification, he was not involved in obtaining Beatriz's consent to a broader search and, to the extent he advised the officers who conducted the search that consent had been given, there is no

evidence Wiles misrepresented the nature or scope of the consent. Wiles did not participate in the search of plaintiffs' home.

We conclude, therefore, the City and Wiles were entitled to summary adjudication on the Civil Code section 52.1 cause of action. Because there is no federal constitutional violation and no conduct alleged which violates a state constitutional right separate and distinct from federal protections, there is no conduct on which to base a claim for liability under section 52.1.[53]

### III. DEFENDANTS WERE ENTITLED TO SUMMARY ADJUDICATION ON THE BATTERY CAUSE OF ACTION

David pled a cause of action for battery based on Harris and Jimenez handcuffing him at the gas station.

 The undisputed evidence shows the handcuffing occurred after David became belligerent and argued with Harris. Wiles testified David was irate, using profanities and "visibly agitated." In *Venegas III* we held the officers had probable cause to arrest David and handcuffing him did not violate his Fourth Amendment right to be free from unreasonable seizure. We held: "Because David conceded he was agitated and hostile when approached by the officers, handcuffing him was reasonably justified by the need of a 'reasonably prudent' officer to protect himself and others . . . ." This holding collaterally estops David from maintaining a battery action against the officers who handcuffed him because a battery is not committed by a police officer unless the plaintiff proves the officer used unreasonable force.[54] Penal Code section 835a states: "Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest . . . to overcome resistance."

Therefore defendants were entitled to summary adjudication on David's cause of action for battery.[55]

---

[53] *Reynolds v. County of San Diego, supra,* 84 F.3d at pages 1170–1171.

[54] *Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1273 [74 Cal.Rptr.2d 614].

[55] We note, in addition, Deputy Jimenez was dismissed as a defendant prior to defendants' motion for summary judgment and the undisputed facts show Wiles was not involved in David's handcuffing.

IV. *THE TRIAL COURT ERRED IN GRANTING THE DEFENDANTS SUMMARY ADJUDICATION ON THE NEGLIGENCE CAUSE OF ACTION.*

A. Venegas III *Only Determined the Initial Detention and Questioning of Plaintiffs Did Not Violate Their Constitutional Rights.*

In *Venegas III* we concluded the defendant officers were not liable under 42 United States Code section 1983 for the detention of David and Beatriz and the search of their home. Defendants contend our ruling is res judicata as to plaintiffs' cause of action for negligence. We disagree.

We do not need to address the question whether plaintiffs' common law negligence action involves the same "primary right" as their action under 42 United States Code section 1983 for violation of their Fourth Amendment right to be free from unreasonable search and seizure. *Venegas III* only decided the officers' *initial* detention and questioning of David and Beatriz did not violate their Fourth Amendment rights. The officers escaped constitutional liability for their succeeding conduct either because they were not involved in it (e.g., Wiles did not participate in the search of plaintiffs' home) or because we determined they were entitled to qualified immunity under *Saucier v. Katz* since it would not have been clear to a reasonable officer his conduct was unlawful under the circumstances.[56] There is no comparable qualified immunity under California law.[57]

B. *Triable Issues of Fact Exist as to Whether the Defendant Officers Were Negligent in Their Conduct Following the Initial Detention of David and Beatriz at the Gas Station.*

Defendants have failed to show no triable issues of material fact exist as to plaintiffs' cause of action for negligence. On the contrary, as we discussed in *Venegas I*, there was substantial evidence in the first trial from which a jury reasonably could find the defendant officers negligent in detaining plaintiffs

---

[56] See *Saucier v. Katz, supra*, 533 U.S. at page 202. We noted in *Venegas III* the search of the plaintiffs' home constituted "a possible Fourth Amendment violation."

[57] *Robinson v. Solano County* (9th Cir. 2002) 278 F.3d 1007, 1016–1017 holding officers were entitled to qualified immunity under *Saucier* on the plaintiff's federal law claim of excessive force but not on the plaintiff's California law claim of negligence. And see *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 215 [285 Cal.Rptr. 99, 814 P.2d 1341]; *Scruggs v. Haynes* (1967) 252 Cal.App.2d 256, 264–265 [60 Cal.Rptr. 355].

and searching their home following their initial detention at the gas station. Defendants produced no new material evidence in support of their motion for summary judgment.

Although the officers may have had reasonable suspicion of the Vehicle Code violation, the evidence presents a jury question as to whether the traffic stop detention was unreasonably prolonged for a two-hour period, which included a search of plaintiffs' home. From the record before us the jury reasonably could have determined the officers knew within minutes David was not his brother Ricardo. Wiles had a photograph of Ricardo Venegas and a description of him, which Wiles admitted did not closely resemble his brother David. Furthermore, the information obtained by the officers at the gas station did nothing to implicate David and Beatriz in any offense other than the Vehicle Code section 10751, subdivision (a) violation. The officers knew they could have run the name "David Venegas" through their system to see if any results matched up with the individual they had before them. They did not do so. A jury could reasonably conclude from this evidence it was unnecessary for the officers to detain Beatriz further and accompany her to her home. A jury could also find the two-hour detention, including the search of the Venegas home, was not reasonably designed to quickly resolve the issue of David's identity. In other words, a reasonable jury could conclude the detention and search were not reasonably necessary to perform the duties incurred by virtue of the stop (i.e., writing a citation for the Vehicle Code violation or effecting a custodial arrest under Vehicle Code section 40302, subdivision (a)). In fact, a jury could conclude the information the officers obtained at the gas station actually *dispelled*, rather than verified, suspicions of any further criminal activity, including the suspicion the Cougar automobile was stolen.

As we have previously noted, the evidence shows the officers' handcuffing of David was initially justified by the need of a "reasonably prudent" officer to protect himself and others during the traffic stop. It is, however, a question for the jury as to whether the continued detention and handcuffing of David was reasonable.

Accordingly, whether the search of plaintiffs' home was with or without their valid consent, plaintiffs were nevertheless detained during the search as a result of a traffic stop. The evidence is sufficient to raise a jury question as to whether the detention of David and Beatriz was unlawfully prolonged and intrusive and not properly within the scope of activities permitted by the stop.

A jury also could find Wiles, Gray, Harris and Jimenez were all involved in the detention. The involvement of Wiles and Harris is established by their own testimony; Gray admitted he participated in the decision to detain David; and David testified Harris and Jimenez were the ones who held him and

handcuffed him. The evidence is also sufficient to raise a jury question regarding the point when the conduct of the officers evolved from a traffic stop into the arrest of David and whether their conduct constituted an arrest of Beatriz.

Turning to the search of plaintiffs' home, the facts are disputed as to the scope of the consent. Plaintiffs presented sufficient evidence to permit a jury to infer there was no voluntary and valid consent to search the home and plaintiffs consented only to have an officer accompany Beatriz into the home in order for her to retrieve her husband's identification. While Beatriz admitted signing the written entry and search waiver form, that is just one circumstance for the jury to consider in determining whether there was a valid consent to search. The jury could infer Beatriz signed the waiver form reasonably believing she was only consenting to having an officer transport her to, and escort her into, her home for the purpose of retrieving David's driver's license. At least in our review of the trial court's summary judgment for defendants it is permissible to discount the broad, literal language of the preprinted form signed by Beatriz in evaluating the validity of her consent on the ground she reasonably believed she was only consenting to having an officer escort her home to retrieve David's identification so the police would let her husband go. Indeed, Wiles admitted this was precisely what he told Beatriz.

A jury could also conclude Wiles knew plaintiffs had not consented to a search of their home, yet Wiles told Kerkhof the Venegases had consented to such a search. In other words, it was Wiles who was responsible for the other officers searching plaintiffs' home, even though Wiles personally did not conduct the search.

In addition, sufficient evidence in the record creates a jury question as to whether the officers took advantage of David's failure to possess a drivers license or identification card in order to search his home without probable cause and without reasonable suspicion of any criminal activity on his part but simply because he happened to be the brother of Ricardo who was the subject of another investigation. Because the jury could infer arbitrary or capricious conduct on the part of the officers, triable issues exist as to whether the search was lawful pursuant to David's probation condition.

For the reasons stated above, defendants were not entitled to summary adjudication on plaintiffs' cause of action for negligence.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to vacate its order granting summary judgment as to the remaining causes of action in this case and to issue a new order (1) granting the motion of the City of Vernon, the Vernon Police Department and Detective Wiles for summary adjudication as to plaintiffs' cause of action under Civil Code section 52.1 for violation of their constitutional rights and as to their cause of action for battery and denying the motion as to plaintiffs' cause of action for negligence; (2) granting the motion of the County of Los Angeles and Deputy Harris for summary adjudication as to plaintiffs' cause of action for battery and denying the motion as to plaintiffs' cause of action under Civil Code section 52.1 for violation of their constitutional rights and as to their cause of action for negligence. The parties shall bear their own costs on appeal.

Woods, J., and Zelon, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 31, 2007, S156330.